ERNEST L. HOSPES *et al. vs.* NORTHWESTERN MANUF'G & CAR CO.

Argued Dec. 14, 1891. Decided Jan 18, 1892.

**Practice—Stockholder, how Made to Pay for Bonus Stock.**—The equitable right of creditors of a corporation to compel the holders to pay for "bonus" stock may be enforced in a sequestration proceeding, under 1878 G. S. ch. 76, upon the complaint of any interested creditor who has become a party to the proceeding.

**Corporate Capital, how Far a Trust Fund.**—The so-called "trust-fund" doctrine, that "the capital of a corporation is a trust fund for the payment of its debts," considered and criticised.

**Trust—Corporate and Private Property are Alike.**—The capital of a corporation is its own property, which it may use and dispose of (if not prohibited by its charter) the same as a natural person. It is not held in trust for creditors, except in the sense that there can be no distribution of it among stockholders without provision being first made for the payment of corporate debts, and that, as in the case of a natural person, any disposition of it in fraud of creditors is void; and in this respect there is no distinction between unpaid capital and paid capital, between "stock subscriptions" and any other assets of the corporation.

**Fraud, the Ground of Liability.**—The right of creditors to compel the holders of "bonus" stock to pay for it, contrary to their actual agreement with the corporation, rests neither on implied contract nor upon any "trust-fund" doctrine, but upon the ground of fraud.

**Misrepresenting the Amount of Capital is the Fraud.**—The fraud, in such case, consists in the misrepresentation as to the actual amount of capital, upon the faith of which persons have dealt with the corporation and given it credit.

**Creditors Trusting with Knowledge are not Defrauded.**—Hence it is only those creditors who have relied on, or who can fairly be presumed to have relied on, the stock representing actual capital, in whose favor equity will enforce payment of such stock. Consequently payment can never be enforced in favor of one who became a creditor before the "bonus" stock was issued.

**Pleading—On which is the Burden of Pleading and Proof.**—It is not necessary that a "subsequent" creditor should have alleged that when he dealt with the corporation he believed that the stock had been paid for, and that he gave credit on the faith of it. If in fact the creditor had knowledge of the arrangement by which the "bonus" stock was issued, that is a matter of defense, to be set up by the defendant stockholder.

**Assignee of Claim must State what he Paid—Show Equity.**—Where a creditor asks for such relief against a stockholder, he should show his own equities entitling him to such relief. Hence, when it appears that he is not the original creditor, but had purchased the claims after the corporation had become insolvent, and its affairs had been placed in the hands of a receiver, he should state what he paid for the claims, or at least show that he paid a substantial consideration for them. Equity will not grant such relief for the benefit of those who have bought up claims against an insolvent corporation for a nominal consideration, for the purpose of speculating on the liability of stockholders.

When Cause of Action Accrues.—The right of action in favor of creditors against the holders of such bonus stock does not accrue until the corporation becomes insolvent.

Contingent Claim against the Estate of a Deceased Person.— A claim of this kind in favor of creditors against the estate of a deceased stockholder, before the assets of the corporation are fully administered, is a "contingent claim," within the meaning of chapter 53, Gen. St.

Appeal by Charles D. Gilfillan, John Kerwin, Henry B. Willis, and others, holders of common stock in the Northwestern Manufacturing & Car Company, from an order of the district court, Washington county, made July 14, 1891, overruling their demurrer to the supplemental complaint of the Minnesota Thresher Manufacturing Company filed in the insolvency proceedings pending against said first-named corporation.

The Northwestern Manufacturing & Car Company was a manufacturing corporation organized May 10, 1882, under 1878 G. S. ch. 34, § 120. It confessed judgment in the district court, May 10, 1884, in favor of Ernest L. Hospes and W. K. Wurdeman, for $364.03. Execution was issued on the judgment, and returned wholly unsatisfied. Thereupon Hospes and Wurdeman commenced an action in the district court, Washington county, setting forth these facts, and praying that the property of the corporation be sequestered, and a receiver appointed to continue its business until a sale could be made under the order of the court. 1878 G. S. ch. 76, § 9. On the same day an order was granted requiring the corporation to show cause before *McCluer*, J., why such receiver should not be appointed at once. The parties appeared, and by consent E. S. Brown was on said May 10, 1884, appointed such receiver of the property of the corporation, and empowered to continue its business, employ and discharge officers, prosecute and defend suits, and wind up its affairs. The receiver thus appointed, qualified, and entered upon the discharge of his trust. The district court on September 9, 1884, made another order, requiring all the creditors of the Northwestern Manufacturing & Car Company to exhibit their claims within six months after the first publication of the order, and become parties to the proceeding, and in default thereof that they be precluded from all benefit of the

judgment, and from sharing in the distribution of the assets realized under such judgment.

The Minnesota Thresher Manufacturing Company, another corporation, thereupon presented and filed its claim against the insolvent Northwestern Manufacturing & Car Company, and afterwards, on October 28, 1889, by leave of the court, presented and filed its supplemental complaint, (1878 G. S. ch. 76, § 16,) on behalf of itself and all the other creditors, and against these appellants and more than 100 others, holders of the common stock of said insolvent corporation, to compel them severally to pay to the receiver the face value of this common stock, claiming that this common stock was issued without any payment whatever to the corporation for it; that some of the defendants received it through devices stated in the opinion, and that others took assignments of shares from first holders with full knowledge of all the facts. An order was entered making all these holders of common stock parties to the action, and requiring them to enter their appearance and to answer the complaint, and providing for the service of a summons upon each to answer in conformity with the order.

This supplemental complaint stated that the debts of said Northwestern Manufacturing & Car Company exceeded $3,400,000; that the intervener, the Minnesota Thresher Manufacturing Company, did, prior to October 27, 1887, purchase and become the owner of $1,-703,000 thereof; that all the assets of said insolvent car company had been sold, and had realized $1,105,000, but that the expenses contracted by the receiver in continuing the business and completing the articles in process of manufacture were $770,000, and that there remained only $335,000 to apply upon the indebtedness of the insolvent car company; that the stock consisted of $3,500,000 preferred and $1,500,000 common; that the preferred was to receive dividends of 7 per cent. annually and no more; the common to receive no dividend until the dividend on preferred should be first paid out of the profits realized in the business; that the common stock was issued and delivered to defendants without consideration; that it was bonus stock, and was given by said Northwestern Manufactur-

ing & Car Company gratuitously to defendants; that some of such common stock was thereafter transferred by the persons receiving it to the other defendants, but that they each had full notice and knowledge before purchasing that nothing had been paid to the corporation for it, and that it was issued as a bonus, and without consideration. The complaint prayed that each of the holders of such common stock account with the receiver and said thresher company and the other creditors concerning said common stock, and their liability to pay therefor, and that it be adjudged that each of the holders of common stock pay into court an amount equal to the par value of their respective holdings of such stock, and that the money be distributed among the creditors.

Many of the holders of the common stock appeared and demurred to this complaint, upon grounds stated in the opinion, and it was stipulated that M. D. Grover, Esq., should, as referee, hear argument, and report to the court what order he advised to be made upon the demurrers. He heard argument, and reported, July 14, 1891, that the demurrers should be overruled, and it was so ordered. The defendants appealed to this court.

Among the defendants was the St. Paul Trust Company, as executor of the last will of Norman W. Kittson, who died May 10, 1888, and who at his death held $50,000 of said common stock. This executor contended that this claim should have been presented to and proved before the probate court of Ramsey county, the domicile of deceased at his death.

*Lusk, Bunn & Hadley,* for some appellants.

We submit the following propositions, believing that all of them can be sustained on principle, and admitting that some of them are opposed to considerable American authority:

*First.* Creditors cannot recover on the ground of contract where the corporation could not. Their right to recover in such cases must be grounded on tort or fraud.

*Second.* There is no distinction between unpaid capital and paid capital, between subscriptions and any other assets of the corporation, as regards the alleged rule that the capital is a trust fund.

*Third.* Neither subscriptions nor any other assets of a corporation

are, in any proper sense, a trust fund. They are both subject to absolute control and disposition by the corporation.

*Fourth.* This power of control and disposition as to corporate assets is precisely equivalent to the same power in a natural person, as to his property; and creditors can interfere with the corporate power of disposal on the identical principles which enable them to question dispositions of property by a natural person.

*Fifth.* The complaint in this case must be tested by the same rules which would be applied to a creditors' bill to reach assets of a natural person, fraudulently disposed of. Tested by those rules, the bill is insufficient, for it does not show a fraud on, or injury to, complainant or other creditors.

This is a case where the contract between the corporation and the taker of its shares is clear and specific that the shares shall not be paid for. On principle, there is no ground for implying a contract that the taker of shares of stock shall pay par for them, where the parties have explicitly agreed that no such implication shall be made, and that the shares shall not be paid for. Logically, no such contract can be implied. *In re Dronfield, etc., Co.,* 17 Ch. Div. 76, 97; *Waterhouse* v. *Jamieson,* L. R. 2 H. L. Sc. 29; *Christensen* v. *Eno,* 106 N. Y. 97, 102.

In England, since the act of 1867, there is, indeed, an implied contract in such cases, which no express contract can negative. That act says every share in any company shall be deemed and be taken to have been issued and to be held subject to the payment of the whole amount thereof in cash, etc. This creates a contract by statute, and makes every contrary contract void. *In re Johannesburg Hotel Co.,* [1891] 1 Ch. Div. 119, 126; *In re Addlestone Linoleum Co.,* 58 Law T. R. (N. S.) 428.

This is rational ground. It does not rest on the trust-fund doctrine, nor on any implication of a contract contrary to the real one; and it does not violate the rule, always adhered to in England, that creditors have only the rights of the corporation.

It cannot be said that such a contract can be implied by virtue of any statute of Minnesota. We have no statute equivalent to the provision quoted from the English act of 1867. In the manufacturing cor-

poration act of 1873, under which the car company was incorporated, there is no prohibition of bonus stock. But, supposing that our law forbids such issues, the result is, logically, that the same are *ultra vires* and void. The transaction can, at most, be held void or rescinded, and the bonus stock canceled. *Anderson's Case,* 7 Ch. Div. 75; *In re Plaskynaston Tube Co., (In re Ince Hall Rolling Mills Co.,)* 23 Ch. Div. 545, note; *Currie's Case,* 3 De Gex, J. & S. 366; *Baron de Beville's Case,* L. R. 7 Eq. 11; *Phelan* v. *Hazard,* 5 Dill. 45; *Brant* v. *Ehlen,* 59 Md. 1; *Coffin* v. *Ransdell,* 110 Ind. 422. So far as this point is concerned, there is no rational ground of distinguishing cases like this, where the stock is wholly a bonus, from cases where overvalued property is exchanged for stock, and the stock consequently partly a bonus. In either case, if the transaction is illegal, it ought merely to be set aside; the court ought not to create a contract the direct reverse of that which the parties have actually made.

Much confusion exists in stating the trust-fund doctrine. Some cases say that unpaid subscribed capital is a trust fund, while ordinary assets are not. There is no difference, as respects that rule, between an unpaid subscription and any other asset. The capital includes all the assets, and it is immaterial how they are invested. Lands, moneys, choses in action, and claims on subscriptions are all equally capital. Capital cannot change from a trust to not a trust, or the reverse, by a change of form. It is all of the same character, and is either all a trust or all not a trust. A trust implies two estates or interests,—an equitable and a legal. One person holds the legal estate, and another has the use, profit, and beneficial interest. Where both interests unite in the same person, there is a merger, and the trust is extinguished. Absolute control and power of disposition are not compatible with the conception of a trust. No one would say that a natural person holds his property in trust for his creditors. There is just as little accuracy in saying that a corporation so holds its property, and its property is its capital.

That capital is a trust fund has never been affirmed in England. The doctrine was invented by Judge Story in *Wood* v. *Dummer,* 3 Mason, 308, a case which, it is clear, called for no such invention. When a corporation makes a voluntary disposition of its

assets to stockholders, as in that case, or to others, leaving its debts unpaid, creditors have a clear right to follow those assets. They would have the same right to follow property of a natural person. The ground of recovery is ancient. This is a fraud on creditors. That statement covers the whole case, and it was unnecessary to invent any new rule of law.

But the language of Judge Story has been greedily caught at, has been thought to be a new discovery, and has been put forth as a solution of every question arising on this subject. The statement is plausible and taking.

But in fact the corporation has the whole legal title as well as the whole use or beneficial interest. It may use the income and profits, as an individual may use his property. It is a trustee to the same extent, but no further. An individual may dispose of his property as he pleases, subject to well-settled equities of creditors, which are, in general terms, defined by saying that he cannot dispose of his property so as to defraud creditors. A voluntary disposition is *prima facie* fraudulent as to existing creditors, while not so as to subsequent creditors. As to them, there must, in general, be an actual intent to defraud.

We do not object to the statement that capital is a trust fund, as respects the power of directors to deal with it, contrary to the rights of the corporation. Directors clearly act as trustees, or, what comes to the same thing, as agents. When the question respects their power to dispose of capital as against the stockholders, they may well be regarded as trustees. But when the question concerns the power of the whole corporation to deal with or dispose of its assets, the corporation is in no sense a trustee. It has the same power which a natural person has over his property. It is no more a trustee than he is, and its assets are no more trust funds than his assets are. *Graham* v. *La Crosse & M. R. Co.*, 102 U. S. 148.

The various and inconsistent statements of the trust-fund rule are well illustrated by the following cases, and their statements are the best refutation of the doctrine: *Sawyer* v. *Hoag*, 17 Wall. 610; *Upton* v. *Tribilcock*, 91 U. S. 45, 48; *Sanger* v. *Upton*, 91 U. S. 56, 60; *County of Morgan* v. *Allen*, 103 U. S. 498, 508; *Wabash, St. L. & P.*

*Ry. Co.* v. *Ham*, 114 U. S. 587, 594; *Coit* v. *North Carolina Gold Amalgamating Co.*, 14 Fed. Rep. 12; *Clark* v. *Bever*, 139 U. S. 96, 110; *Fogg* v. *Blair*, 139 U. S. 118, 125.

Except as against creditors, a corporation can donate its moneys, its lands, or its other chattels, or any part of them, to either a stockholder or stranger. If the assets, or any part of them, are given back to the stockholders, the result is the same as if the shares had, wholly or partly, been issued as a bonus. The bonus stock issue is a short cut to the same result, which would be reached by a division of assets among stockholders. So dividends out of capital, voluntary conveyances of assets, issuing shares for overvalued property, and bonus stock are all forms of one and the same transaction. They all reach the same result by different means, and that is a disposition of corporate assets which may be or may not be a fraud on corporate creditors. The court will inquire into every such devise with a view to determine whether the corporation has disposed of assets so as to defraud creditors, precisely as it would inquire whether a natural person or copartnership had done the same thing.

The bill in this case is to be regarded as a creditors' bill to reach assets of the corporation fraudulently conveyed. The creditors are all subsequent creditors; their debts were incurred after the disposition complained of. Such creditors must ordinarily allege an actual intent to defraud, and actual consummation of that fraud. They must show and prove that they relied on facts fraudulently misrepresented to them, and gave credit so relying. *Graham* v. *La Crosse & M. R. Co.*, 102 U. S. 148, 153; *Horbach* v. *Hill*, 112 U. S. 144, 149; *Jones* v. *Clifton*, 101 U. S. 225; *Carr* v. *Breese*, 81 N. Y. 584; *Sexton* v. *Wheaton*, 1 Amer. Lead. Cas. 17, and note.

But it will probably not be contended that this is a good creditors' bill, tested by the rules which apply ordinarily when subsequent creditors seek to set aside a debtor's conveyance. If the creditor knew of the bonus stock when he gave credit, he cannot complain. *First Nat. Bank* v. *Gustin*, etc., *Min. Co.*, 42 Minn. 327. This harmonizes with the law applied to subsequent creditors of natural persons. *Monroe* v. *Smith*, 79 Pa. St. 459.

The bill does not set out whose claims the intervener has bought;

possibly its assignors were all stockholders who participated in the bonus issue; possibly all of them otherwise knew of the arrangement. The intervener doubtless knew the whole scheme when it bought, for it was organized after the failure of the car company, and for the purpose of succeeding to its property and business. It must rely on the equity of its vendors. Why ought it not to be required to set forth and prove those equities.

The intervener says that it was incorporated after the failure of the car company, for the purpose of acquiring the plant and business of that company. In pursuance of this plan, it has bought the claims of creditors. It does not say what it paid for these claims, but asks in this suit the interposition of a court of equity to aid it in enforcing its equities. We may concede that whatever legal rights the creditors had, the intervener succeeded to as purchaser. But it will not do for a complainant in equity to rest on a mere legal title. Courts of law are competent to adjust legal rights. In chancery courts the plaintiff must fully, specifically, and without evasion set forth his equities, and show the court that the decree prayed is equitable and conformable to good conscience. A court of equity sits to do equity. It always turns a complainant over to his action at law, unless he shows that the decree prayed is not only legal, but equitable and just. There must be conscience, good faith, and diligence to invoke equity. *McKnight* v. *Taylor*, 1 How. 161; *Creath* v. *Sims*, 5 How. 192; *Badger* v. *Badger*, 2 Wall. 87; *Mississippi & M. R. Co.* v. *Cromwell*, 91 U. S. 643; *Randolph* v. *Quidnick Co.*, 135 U. S. 457.

*Warner, Richardson & Lawrence,* for some appellants.

It was incumbent on plaintiff to plead that it and the other holders of the allowed claims trusted the car company in reliance on the common stock having been fully paid. There is no presumption to that effect. Furthermore, it was essential to state when and how plaintiff discovered the alleged fact of nonpayment. For aught there appears, the plaintiff and all concerned knew perfectly well all the time just what the plan of reorganization was, and all its terms. *Griggs* v. *City of St. Paul*, 9 Minn. 246, (Gil. 231;) *First Nat. Bank* v. *Gustin, etc., Min. Co.*, 42 Minn. 327.

*Searles & Gail,* for some appellants.

The complaint avers that the property of Seymour, Sabin & Co. was turned over to the car company for the agreed price of $2,297,-000, and that preferred stock of the car company to that amount was received in full payment therefor. It then sets out that the projectors of the car company were desirous of issuing to themselves and obtaining for their own benefit the common stock of said car company without paying therefor; that for that purpose they caused Seymour, Sabin & Co. to subscribe for and agree to take from said Northwestern Manufacturing & Car Company its common stock, of the par value of $1,500,000. It then alleges that Seymour, Sabin & Co. did duly subscribe for and agree to take said stock, but never paid any consideration for it; that such common stock was issued to D. M. Sabin, and by him distributed to the defendants or others, under whom defendants, with notice, hold.

This is not a case where a corporation has taken or subscribed for stock of another corporation in the legitimate pursuit of its corporate enterprise, but a subscription for the benefit of others, without consideration, and without the scope of the corporate undertaking. Such a subscription is *ultra vires* the corporation and void. By subscribing for the stock, Seymour, Sabin & Co. undertook to appropriate its assets to the business of the car company, which it had no authority to do. Beach, Corp. § 394; *Valley Ry. Co.* v. *Lake Erie Iron Co.*, 46 Ohio, 44; *Central R. Co. of New Jersey* v. *Pennsylvania R. Co.*, 31 N. J. Eq. 475; *Franklin Co.* v. *Lewiston Sav. Inst.*, 68 Me. 43; Mor. Corp. § 433; Green's Brice, Ultra Vires, 95, note.

There having been no valid subscription for the stock, it was issued gratuitously, with the understanding of all the parties. This state of facts does not give the car company or its receiver or creditors any right of action against the holders of this common stock. *Christensen* v. *Eno,* 106 N. Y. 97; 25 Amer. Law Rev. 749; *Seymour* v. *Sturgess,* 26 N. Y. 134.

The stock in question could, doubtless, be canceled, on suit of *bona fide* stockholders, but it was issued without any agreement of the holders to pay therefor, and the courts cannot create a contract to pay therefor. 1878 G. S. ch. 34, § 412.

To assume that the holder of full-paid stock issued in violation of the statute becomes a subscriber to such stock, and, as such, liable to pay therefor, is to say that an act prohibited by the statute is a valid act, and out of it arises, by construction, an obligation directly contrary to the express understanding of the parties.

*Horace G. Stone,* for some appellants.

There is no allegation of fraudulent intent. It is only necessary to observe in this connection that being desirous of obtaining stock without paying for it is not unlawful, under the laws of this state; and that being desirous of obtaining such stock without consideration, and actually thus getting it, is not unlawful, if the donor agreed to it, and if no one else was prejudiced thereby. Being desirous of a donation and receiving it do not alone show any unlawful intent, there being no existing creditors unpaid, and no intent to defraud subsequent creditors being alleged. No fraudulent intent of any kind is alleged. *Fogg* v. *Blair,* 139 U. S. 118; *Griggs* v. *City of St. Paul,* 9 Minn. 246, (Gil. 231;) *Clark* v. *Bever,* 139 U. S. 96; *Handley* v. *Stutz,* Id. 417. The respondent is a subsequent creditor, and as such cannot complain.

*Harvey Officer,* for appellant St. Paul Trust Company.

The complaint as amended states that Norman W. Kittson, one of the holders of said common stock, died May 10, 1888, testate, leaving to the devisees and legatees under his will an estate consisting of real and personal property of the value of many millions of dollars; that defendant the St. Paul Trust Company was the executor named in said will; that said will has been duly proved and allowed, and said defendant duly appointed as such executor, and letters testamentary issued to it; that it has entered upon the execution of said trusts under said will, and has ever since had, and now has, possession and control of said real estate and personal property so owned and held by said Norman W. Kittson at the date of his death. But the complaint, as amended, should also have averred that no time had been fixed by the probate court for presenting such claims, or that no notice thereof had been given. Without such affirmative allegations, it is demurrable for want of jurisdiction. The

referee disposed of this contention by deciding that the claim may be proved when it becomes absolute by the final determination of the court in this action, establishing the fact of the liability and its extent.

It is no part of the relief asked in this action that when the liability of Kittson's estate shall be determined here the judgment shall be certified to the probate court; nor does 1878 G. S. ch. 76, contemplate or furnish any such remedy. On the contrary, it declares that whatever judgment it renders must be executed and collected, if at all, through the remedies of the district court. Measured by the definitions of what is a contingent claim, and the remedies thereon, under our statute, it follows, as a logical sequence, that the probate court is absolutely without jurisdiction to entertain a claim of this character as a contingent claim, either in the present or future. *McKeen* v. *Waldron*, 25 Minn. 466; *Palmer* v. *Pollock*, 26 Minn. 433; *O'Gorman* v. *Lindeke*, Id. 93; *Ernst* v. *Nau*, 63 Wis. 134.

*Flandrau, Squires & Cutcheon* and *Davis, Kellogg & Severance*, for respondent.

Stock in a corporation is a trust fund for the benefit of creditors, and subsequent creditors have a right to presume that shares of stock either have been paid for in full, or will be paid for when necessary to satisfy creditors' claims.

Any scheme, devise, or plan, whereby stock is sought to be issued to any person without paying therefor, is an evasion of the foregoing principle, and is void as to creditors, unless those creditors, by their course of dealing with the corporation, with full knowledge of this scheme, are estopped to question it.

The bill of complaint alleges that the stockholders of Seymour, Sabin & Co., together with all other persons who originated and organized the car company, being desirous of procuring this stock without paying therefor or without incurring any liability to pay therefor, and in order to avoid and set at naught the laws of this state, caused Seymour, Sabin & Co. to subscribe for and agree to take this common stock; that the same was subscribed for, was issued to D. M.

Sabin as trustee, and by him distributed to said stockholders, and to the other defendants, who received it with notice of this fraudulent scheme; that subscription has not been and could not be released as to creditors, and the creditors have a right to enforce that subscription as against Seymour, Sabin & Co.; and as against the defendants who are parties to the scheme, and who took the stock with knowledge of it. The authorities on this question abundantly sustain our position. *Farnsworth* v. *Robbins,* 36 Minn. 369 ; 1 Beach, Corp. §§ 116, 118; Cook, Stock & S. § 42; Mor. Corp. §§ 780, 781; *Wood* v. *Dummer,* 3 Mason, 308; *Shickle* v. *Watts,* 94 Mo. 410; *Skrainka* v. *Allen,* 76 Mo. 384; *Union Mut. Life Ins. Co.* v. *Frear Stone Mfg. Co.,* 97 Ill. 537; *Morrow* v. *Iron & Steel Co.,* 87 Tenn. 262; *Hickling* v. *Wilson,* 104 Ill. 54; *Adler* v. *Milwaukee Patent Brick Mfg. Co.,* 13 Wis. 57; *Wetherbee* v. *Baker,* 35 N. J. Eq. 501.

The federal authorities also fully sustain this rule. *Flinn* v. *Bagley,* 7 Fed. Rep. 785; *Preston* v. *Cincinnati, C. & H. V. R. Co.,* 36 Fed. Rep. 54; *Sawyer* v. *Hoag,* 17 Wall. 610; *Hawley* v. *Upton,* 102 U. S. 314; *Upton* v. *Tribilcock,* 91 U. S. 45; *Hatch* v. *Dana,* 101 U. S. 205; *Scovill* v. *Thayer,* 105 U. S. 143, 152; *Coit* v. *North Carolina Gold Amalgamating Co.,* 14 Fed. Rep. 12, affirmed 119 U. S. 343; *Fogg* v. *Blair,* 139 U. S. 118; *Clark* v. *Bever,* Id. 96.

That the transferee of unpaid stock is liable for the balance due thereon to the creditors of a corporation is so well established as to need no argument. Cook, Stockholders, § 256; *Webster* v. *Upton,* 91 U. S. 65; Beach, Corp. § 131.

1878 G. S. ch. 76, undoubtedly was intended to provide a remedy for collecting unpaid subscriptions, enforcing stockholders' liabilities, winding up the affairs, and distributing the assets of corporations of every kind. It is so provided by the first section of the chapter, and has been so held by this court. *Allen* v. *Walsh,* 25 Minn. 543, 555; *Johnson* v. *Fischer,* 30 Minn. 173; *Merchants' Nat. Bank* v. *Bailey Mfg. Co.,* 34 Minn. 323. Therefore that construction should be placed upon the various sections of chapter seventy-six (76) that would facilitate this object without multiplicity of suits, and consummate this in one action. It seems to us the provisions of chapter seventy-six (76) are ample for this purpose, and in fact have been so

held by this court.  *Merchants' Nat. Bank* v. *Bailey Mfg. Co.*, 34 Minn. 323; *Arthur* v. *Willius*, 44 Minn. 409.

The only demurrer we deem it necessary to discuss separately is that of the St. Paul Trust Company. The court acquired jurisdiction over this defendant when the order or process was served upon it. It appears here that the defendant submitted to the jurisdiction and demurred to the complaint. By demurring, a party appears in an action. 1878 G. S. ch. 66, § 72. The fact of the failure of the court to acquire jurisdiction by reason of the defect in process cannot be raised by demurrer. It is only where the court has no jurisdiction of the subject-matter, and cannot acquire it, or perhaps where a person is not amenable to the process of the court, such as a foreign minister or a sovereign state, that the question can be raised by demurrer. *Reynolds* v. *La Crosse & M. Packet Co.*, 10 Minn. 178, 185, (Gil. 144.)

The main contention in this case is that this was not a contingent claim, and hence must have been presented to the probate court. It is contingent upon the property of the corporation being sufficient to pay its debts. The claim could not be filed against the estate other than as a contingent claim. Suppose it had been filed as a regular claim, for how much should it be allowed? No one can tell until an accounting has been had, and the property of the corporation applied to the payment of its debts, or the receiver's accounts finally settled and closed, and the property distributed. Before this could be done in most cases the six months for the presentation of claims to the probate court would have expired. It would be establishing a rule that could not be followed to say that, in closing up the affairs of an insolvent corporation, the creditors or the receiver must file claims with the probate court in the estate of deceased stockholders before it is ascertained whether it would be necessary to pursue those stockholders for the debts of the corporation. If it was once a contingent claim, then the creditor need not present it to the probate court. It certainly has never yet become absolute as to any certain amount, and, within the holdings of the courts, it is a contingent claim. *McKeen* v. *Waldron*, 25 Minn. 466; *Mann* v. *Everts*, 64 Wis. 372; *French* v. *Morse*, 2 Gray, 111, 114; *Woodard* v. *Herbert*, 24 Me. 358; *Dole*

**v.** *Warren,* 32 Me. 95. A suit against the executor for this purpose is expressly authorized by 1878 G. S. ch. 53, §§ 46, 51. *Cummings* v. *Halsted,* 26 Minn. 151.

The statute of limitations will not begin to run as between the corporation and its stockholders until the corporation has called all unpaid subscriptions, and the stockholders have made default; and the statute will not begin to run as to creditors until the creditors' right of action accrues, and when the creditors' right of action will accrue depends upon the nature of the action. If it is a cause of action for assets of the corporation, divided up among the stockholders, then it does not accrue until after a return of execution unsatisfied, and a judgment of sequestration of the corporation's assets. If it is a cause of action for unpaid subscriptions, then it does not accrue until the corporation has been adjudged insolvent. 1878 G. S. ch. 34, § 9; Cook, Stock & S. §§ 195, 225, 548; Thomp. Liab. Stockh. §§ 291, 293, 312; *Hawkins* v. *Glenn,* 131 U. S. 319; *Sturges* v. *Vanderbilt,* 73 N. Y. 384; *Handy* v. *Draper,* 89 N. Y. 334; *Longley* v. *Little,* 26 Me. 162; *Rounds* v. *Green,* 29 Minn. 139; *Baxter* v. *Moses,* 77 Me. 480.

MITCHELL, J. This appeal is from an order overruling a demurrer to the so-called "supplemental complaint" of the Minnesota Thresher Manufacturing Company. The Northwestern Manufacturing & Car Company was a manufacturing corporation organized in May, 1882. Upon the complaint of a judgment creditor, (Hospes & Co.,) after return of execution unsatisfied, judgment was rendered in May, 1884, sequestrating all its property, things in action, and effects, and appointing a receiver of the same. This receivership still continues, the affairs of the corporation being not yet fully administered; but it appears that it is hopelessly insolvent, and that all the assets that have come into the hands of the receiver will not be sufficient to pay any considerable part of the debts. The Minnesota Thresher Manufacturing Company, a corporation organized in November, 1884, as creditor, became a party to the sequestration proceeding, and proved its claims against the insolvent corporation. In October, 1889, in behalf of itself and all other creditors who have exhibited their claims, it filed this complaint against certain stockholders (these appellants)

of the car company, in pursuance of an order of court allowing it to do so, and requiring those thus impleaded to appear and answer the complaint. The object is to recover from these stockholders the amount of certain stock held by them, but alleged never to have been paid for. What was said in *Meagher's Case, ante,* p. 158, 50 N. W. Rep. 1114, (just decided,) is equally applicable here as to the right to enforce such a liability in the sequestration proceeding upon the petition or complaint of creditors who have become parties to it. There is nothing in this practice inconsistent with what was decided in *Minnesota Thresher Mfg. Co.* v. *Langdon,* 44 Minn. 37, (46 N. W. Rep. 310.) The complaint is not the commencement of an independent action by creditors in their own behalf, antagonistic to the rights of the receiver, but is filed in the sequestration proceeding itself, and in aid of it.

The principal question in the case is whether the complaint states facts showing that the thresher company, as creditor, is entitled to the relief prayed for; or, in other words, states a cause of action. Briefly stated, the allegations of the complaint are that on May 10, 1882, Seymour, Sabin & Co. owned property of the value of several million dollars, and a business then supposed to be profitable. That, in order to continue and enlarge this business, the parties interested in Seymour, Sabin & Co., with others, organized the car company, to which was sold the greater part of the assets of Seymour, Sabin & Co. at a valuation of $2,267,000, in payment of which there were issued to Seymour, Sabin & Co. shares of the preferred stock of the car company of the par value of $2,267,000, it being then and there agreed by both parties that this stock was in full payment of the property thus purchased. It is further alleged that the stockholders of Seymour, Sabin & Co., and the other persons who had agreed to become stockholders in the car company, were then desirous of issuing to themselves, and obtaining for their own benefit, a large amount of common stock of the car company, "without paying therefor, and without incurring any liability thereon or to pay therefor;" and for that purpose, and "in order to evade and set at naught the laws of this state," they caused Seymour, Sabin & Co. to subscribe for and agree to take common stock of the car company of the par value

of $1,500,000. That Seymour, Sabin & Co. thereupon subscribed for that amount of the common stock, but never paid therefor any consideration whatever, either in money or property. That thereafter these persons caused this stock to be issued to D. M. Sabin as trustee, to be by him distributed among them. That it was so distributed without receipt by him or the car company, from any one, of any consideration whatever, but was given by the car company and received by these parties entirely "gratuitously." The car company was, at this time, free from debt, but afterwards became indebted to various persons for about $3,000,000. The thresher company, incorporated after the insolvency and receivership of the car company, for the purpose of securing possession of its assets, property, and business, and therewith engaging in and continuing the same kind of manufacturing, prior to October 27, 1887, purchased and became the owner of unsecured claims against the car company, "*bona fide,* and for a valuable consideration," to the aggregate amount of $1,703,000. As creditor, standing on the purchase of these debts, which were contracted after the issue of this "bonus" stock, the thresher company files this complaint to recover the par value of the stock as never having been paid for. The complaint does not allege what the consideration of these debts was, nor to whom originally owing, nor what the intervener paid for them, nor whether any of the original creditors trusted the car company on the faith of the bonus stock having been paid for. Neither does it allege that either the thresher company or its assignors were ignorant of the bonus issue of stock, nor that they or any of them were deceived or damaged in fact by such issue, nor that the bonus stock was of any value. Neither is there any traversable allegation of any actual fraud or intent to deceive or injure creditors. A desire to get something without paying for it, and actually getting it, is not fraudulent or unlawful if the donor consents, and no one else is injured by it; and the general allegation that it was done "in order to evade and set at naught the laws of the state" of itself amounts to nothing but a mere conclusion of law. As a creditors' bill, in the ordinary sense, the complaint is manifestly insufficient. The thresher company, however, plants itself upon the so-called "trust-fund" doctrine, that

the capital stock of a corporation is a trust fund for the payment of its debts; its contention being that such a "bonus" issue of stock creates, in case of the subsequent insolvency of the corporation, a liability on part of the stockholder in favor of creditors to pay for it, notwithstanding his contract with the corporation to the contrary.

This "trust-fund" doctrine, commonly called the "American doctrine," has given rise to much confusion of ideas as to its real meaning, and much conflict of decision in its application.   To such an extent has this been the case that many have questioned the accuracy of the phrase, as well as doubted the necessity or expediency of inventing any such doctrine.   While a convenient phrase to express a certain general idea, it is not sufficiently precise or accurate to constitute a safe foundation upon which to build a system of legal rules. The doctrine was invented by Justice Story in *Wood* v. *Dummer*, 3 Mason, 308, which called for no such invention, the fact in that case being that a bank divided up two thirds of its capital among its stockholders without providing funds sufficient to pay its outstanding bill holders.   Upon old and familiar principles this was a fraud on creditors.   Evidently all that the eminent jurist meant by the doctrine was that corporate property must be first appropriated to the payment of the debts of the company before there can be any distribution of it among stockholders,—a proposition that is sound upon the plainest principles of common honesty.   In *Fogg* v. *Blair*, 133 U. S. 534, 541, (10 Sup. Ct. Rep. 338,) it is said that this is all the doctrine means.   The expression used in *Wood* v. *Dummer* has, however, been taken up as a new discovery, which furnished a solution of every question on the subject.   The phrase that "the capital of a corporation constitutes a trust fund for the benefit of creditors" is misleading.   Corporate property is not held in trust, in any proper sense of the term.   A trust implies two estates or interests,—one equitable and one legal; one person, as trustee, holding the legal title, while another, as the *cestui que trust,* has the beneficial interest. Absolute control and power of disposition are inconsistent with the idea of a trust.   The capital of a corporation is its property.   It has the whole beneficial interest in it, as well as the legal title.   It may use the income and profits of it, and sell and dispose of it, the

same as a natural person. It is a trustee for its creditors in the same sense and to the same extent as a natural person, but no further. This is well illustrated and clearly announced in the case of *Graham* v. *La Crosse & M. R. Co.*, 102 U. S. 148. That was a creditors' suit to reach a piece of real estate on the ground that it had been conveyed by the corporation fraudulently for a wholly inadequate consideration. The trust-fund doctrine' was invoked by a subsequent creditor, and it was claimed that, as the trust had been violated, the deed should be set aside. If the premise was correct that the corpotion held it in trust for creditors, the conclusion was inevitable; but the court denied the premise, saying that a corporation is in law as distinct a being as an individual is, and is entitled to hold property (if not contrary to its charter) as absolutely as an individual can hold it. Its estate is the same, its interest is the same, its possession is the same; and that there is no reason why the disposal by a corporation of any of its property should be questioned by subsequent creditors any more than a like disposal by an individual; that the same principles of law apply to each. That the phrase that "the capital of a corporation is a trust fund for the payment of its creditors" is misleading, if not inaccurate, is illustrated by the character of the actions that are frequently mistakenly instituted on the strength of it. For example, in the case of *Wabash, etc., R. Co.* v. *Ham,* 114 U. S. 587, (5 Sup. Ct. Rep. 1081,) two roads had been consolidated, the new company acquiring the property of the old ones. A creditor of one of the old companies, on the strength of the "trust-fund" doctrine, claimed a lien on its property in the hands of the new corporation. If this property was impressed with a trust in favor of creditors in the hands of the old company, it would logically follow that it would continue so in the hands of the new one. But the court denied the relief, and, in giving its construction of the "trust-fund" doctrine, said: "The property of a corporation is doubtless a trust fund for the payment of its debts in the sense that when the corporation is lawfully dissolved, and all its business wound up, or when it is insolvent, all its creditors are entitled in equity to have their debts paid out of the corporate property before any distribution thereof among the stockholders. It is also true, in the case of a corporation, as in

v.48m.—13

that of a natural person, that any conveyance of the property of the debtor without authority of law and in fraud of existing creditors is void." This is probably what is meant when it is said in some cases, as in *Clark* v. *Bever*, 139 U. S. 96, 110, (11 Sup. Ct. Rep. 468,) that the capital of a corporation is a trust fund *sub modo*. If so, no one will dispute it. But it means very little, for the same thing could be truthfully said of the property of an individual or a partnership. And obviously it would make no difference whether the disposition of the corporate property is to a stranger or to a stockholder, except that, of course, the latter could not be an innocent purchaser.

There is also much confusion in regard to what the "trust-fund" doctrine applies. Some cases seem to hold that unpaid subscribed capital is a trust fund, while other assets are not,—that is, so long as the subscription is unpaid, it is held in trust by the corporation, but, when once paid in, it ceases to be a trust fund; while other cases hold that, paid or unpaid, it is all a trust fund. The first seems to be the rule laid down in *Sawyer* v. *Hoag*, 17 Wall. 610, in which the "trust-fund" doctrine was first squarely announced by that court with all the vigor and force characteristic of the great jurist who wrote the opinion. In that case a stockholder in an insurance company had given his note, as the court found the fact to be, for 85 per cent. of his subscription to the stock of the company. After the company had become bankrupt, and the stockholder knew the fact, he bought up a claim against the company for one third its face, and in a suit by the assignee in bankruptcy on his note set up this claim as an offset. That this would have been a fraud on the bankrupt act, and at least a moral fraud on policy holders, is quite apparent without invoking the "trust-fund" doctrine; and, if the note for unpaid stock was a trust fund, there could have been no offset, whether the company was solvent or insolvent. In the opinion it is said that, if the subscription had been paid by the note or otherwise, the note ceased thereby to be a trust fund to which creditors can look, and becomes ordinary assets, with which directors may deal as they choose. But in *Upton* v. *Tribilcock*, 91 U. S. 45, it is stated: "The capital paid in and promised to be paid in is a fund which the trustees cannot squander or give away." While in *Sanger* v. *Upton*, Id. 56, it is said:

"When debts are incurred a contract arises with the creditors that it [the capital] shall not be withdrawn or applied otherwise than upon their demands until such demands are satisfied." And in the same connection it is distinctly stated that there is no difference between assets paid in and subscriptions; that "unpaid stock is as much a part of this pledge and as much a part of the assets of the company as the cash which has been paid in upon it. Creditors have the same right to look to it as to anything else, and the same right to insist upon its payment as upon the payment of any other debt due to the company. *As regards creditors, there is no distinction between such a demand and any other asset which may form a part of the property and effects of the corporation.*" This language is quoted and approved in *County of Morgan* v. *Allen*, 103 U. S. 498, 508. It would seem clear that this is the correct statement of the law. The capital (not the mere share certificates) means all the assets, however invested. If a subscriber gives his note for his stock, that note is no more and no less a trust fund than the money would have been if he had paid cash down. Capital cannot change from a trust to not a trust by a mere change of form. It is either all a trust or all not a trust, and the "trust-fund" rule, whatever that be, must apply to all alike, and in the same way. If the assets of a corporation are given back to stock-holders, the result is the same as if the shares had been issued wholly or partly as a bonus. The latter is merely a short cut to the same result. So with dividends paid out of the capital, voluntary convey-ances, stock paid in overvalued property; all are forms of one and the same thing, all reaching the same result, (a disposition of cor-porate assets,) which may or may not be a fraud on creditors, depend-ing on circumstances. This much being once settled, the solution of the question when a subsequent creditor can insist on payment of stock issued as paid up, but not in fact paid for, or not paid for at par, becomes, as we shall presently see, comparatively simple.

Another proposition which we think must be sound is that creditors cannot recover on the ground of contract when the corporation could not. Their right to recover in such cases must rest on the ground that the acts of the stockholders with reference to the corporate cap-ital constitutes a fraud on their rights. We have here a case where

the contract between the corporation and the takers of the shares was specific that the shares should not be paid for. Therefore, unlike many of the cases cited, there is no ground for implying a promise to pay for them. The parties have explicitly agreed that there shall be no such implication, by agreeing that the stock shall not be paid for. In such a case the creditors undoubtedly may have rights superior to the corporation, but these rights cannot rest on the implication that the shareholder agreed to do something directly contrary to his real agreement, but must be based on tort or fraud, actual or presumed. In England, since the act of 1867, there is an implied contract created by statute that "every share in any company shall be deemed and be taken to have been issued and to be held subject to the payment of the whole amount thereof in cash." This statutory contract makes every contrary contract void. Such a statute would be entirely just to all, for every one would be advised of its provisions, and could conduct himself accordingly. And in view of the fact that "watered" and "bonus" stock is one of the greatest abuses connected with the management of modern corporations, such a law might, on grounds of public policy, be very desirable. But this is a matter for the legislature, and not for the courts. We have no such statute; and, even if the law of 1873, under which the car company was organized, impliedly forbids the issue of stock not paid for, the result might be that such issue would be void as *ultra vires*, and might be canceled, but such a prohibition would not of itself be sufficient to create an implied contract, contrary to the actual one, that the holder should pay for his stock.

It is well settled that an equity in favor of a creditor does not arise absolutely and in every case to have the holder of "bonus" stock pay for it contrary to his actual contract with the corporation. Thus no such equity exists in favor of one whose debt was contracted prior to the issue, since he could not have trusted the company upon the faith of such stock. *First Nat. Bank* v. *Gustin, etc., Mining Co.,* 42 Minn. 327, (44 N. W. Rep. 198;) *Coit* v. *Gold Amalgamating Co.,* 119 U. S. 343, (7 Sup. Ct. Rep. 231;) *Handley* v. *Stutz,* 139 U. S. 417, 435, (11 Sup. Ct. Rep. 530.) It does not exist in favor of a subsequent creditor who has dealt with the corporation with full knowl-

edge of the arrangement by which the "bonus" stock was issued, for a man cannot be defrauded by that which he knows when he acts. *First Nat. Bank* v. *Gustin, etc., Mining Co., supra.* It has also been held not to exist where stock has been issued and turned out at its full market value to pay corporate debts. *Clark* v. *Bever, supra.* The same has been held to be the case where an active corporation, whose original capital has been impaired, for the purpose of recuperating itself issues new stock, and sells it on the market for the best price obtainable, but for less than par, (*Handley* v. *Stutz, supra;*) although it is difficult to perceive, in the absence of a statute authorizing such a thing, (of which every one dealing with the corporations is bound to take notice,) any difference between the original stock of a new corporation and additional stock issued by a "going concern." It is difficult, if not impossible, to explain or reconcile these cases upon the "trust-fund" doctrine, or, in the light of them, to predicate the liability of the stockholder upon that doctrine. But by putting it upon the ground of fraud, and applying the old and familiar rules of law on that subject to the peculiar nature of a corporation and the relation which its stockholders bear to it and to the public, we have at once rational and logical ground on which to stand. The capital of a corporation is the basis of its credit. It is a substitute for the individual liability of those who own its stock. People deal with it and give it credit on the faith of it. They have a right to assume that it has paid-in capital to the amount which it represents itself as having; and if they give it credit on the faith of that representation, and if the representation is false, it is a fraud upon them; and, in case the corporation becomes insolvent, the law, upon the plainest principles of common justice, says to the delinquent stockholder, "Make that representation good by paying for your stock." It certainly cannot require the invention of any new doctrine in order to enforce so familiar a rule of equity. It is the misrepresentation of fact in stating the amount of capital to be greater than it really is that is the true basis of the liability of the stockholder in such cases; and it follows that it is only those creditors who have relied, or who can fairly be presumed to have relied, upon the professed amount of capital, in whose favor the law will recognize and enforce an equity against the holders of "bonus" stock.

This furnishes a rational and uniform rule, to which familiar principles are easily applied, and which frees the subject from many of the difficulties and apparent inconsistencies into which the "trust-fund" doctrine has involved it; and we think that, even when the trust-fund doctrine has been invoked, the decision in almost every well-considered case is readily referable to such a rule.

It is urged, however, that, if fraud be the basis of the stockholders' liability in such cases, the creditor should affirmatively allege that he believed that the bonus stock had been paid for, and represented so much actual capital, and that he gave credit to the corporation on the faith of it; and it is also argued that, while there may be a presumption to that effect in the case of a subsequent creditor, this is a mere presumption of fact, and that in pleadings no presumptions of fact are indulged in. This position is very plausible, and at first sight would seem to have much force; but we think it is unsound. Certainly any such rule of pleading or proof would work very inequitably in practice. Inasmuch as the capital of a corporation is the basis of its credit, its financial standing and reputation in the community has its source in, and is founded upon, the amount of its professed and supposed capital, and every one who deals with it does so upon the faith of that standing and reputation, although, as a matter of fact, he may have no personal knowledge of the amount of its professed capital, and in a majority of cases knows nothing about the shares of stock held by any particular stockholder, or, if so, what was paid for them. Hence, in a suit by such creditor against the holders of "bonus" stock, he could not truthfully allege, and could not affirmatively prove, that he believed that the defendants' stock had been paid for, and that he gave the corporation credit on the faith of it, although, as a matter of fact, he actually gave the credit on the faith of the financial standing of the corporation, which was based upon its apparent and professed amount of capital. The misrepresentation as to the amount of capital would operate as a fraud on such a creditor as fully and effectually as if he had personal knowledge of the existence of the defendants' stock, and believed it to have been paid for when he gave the credit. For this reason, among others, we think that all that it is necessary to allege or prove in that regard is that the plain-

tiff is a subsequent creditor; and that, if the fact was that he dealt with the corporation with knowledge of the arrangement by which the "bonus" stock was issued, this is a matter of defense. *Gogebic Inv. Co.* v. *Iron Chief Min. Co.*, 78 Wis. 427, (47 N. W. Rep. 726.) Counsel cites *Fogg* v. *Blair, supra*, to the proposition that the complaint should have stated that this stock had some value; but that case is not in point, for the plaintiff there was a prior creditor; and, as his debt could not have been contracted on the faith of stock not then issued, he could only maintain his action, if at all, by alleging that the corporation parted with something of value.

In one respect, however, we think the complaint is clearly insufficient. The thresher company is here asking the interposition of the the court to aid in enforcing an equity in favor of creditors against the stockholders by declaring them liable to pay for this stock contrary to their actual contract with the corporation. While the proceeding is not, strictly speaking, an equitable action, yet the relief asked is equitable in its nature. Under such circumstances, it was incumbent upon the thresher company to show its own equities, and that it was in a position to demand such relief. It was not the original creditor of the car company, but the assignee of the original creditors. By that purchase it, of course, succeeded to whatever strictly legal rights its assignors had; but it is not rights of that kind which it is here seeking to enforce. Under such circumstances, we think it was incumbent upon it to state what it paid for the claims, or at least to show that it paid a substantial, and not a mere nominal, consideration. The only allegation is that it paid "a valuable consideration." This might have been only one dollar. It appears that it bought the claims after the car company had become insolvent, and its affairs were in the hands of a receiver; also that the indebtedness of that company amounted to about $3,000,000, and that there were not corporate assets enough to pay any considerable part of it. The mere chance of collecting something out of the stockholders does not ordinarily much enhance the selling price of claims against an insolvent corporation. If any person or company had gone to work and bought up for a mere song this large indebtedness of the car company for the purpose of speculating on the

liability of the stockholders, no court would grant them the relief here prayed for. It would say to them, "We will not create and enforce an equity for the benefit of any such speculation." Counsel for respondent suggest that the thresher company is but an organization of the original creditors, who formed it, and pooled their claims, so as to save something out of the wreck of the car company; but nothing of the kind is alleged. On this ground the demurrer should have been sustained.

In view of further proceedings it may be proper to say that in our opinion there is nothing in the position that the right of recovery against the stockholders was barred by the statute of limitation. The argument in support of the proposition all rests upon the false premise that the cause of action accrued in May, 1882, when the bonus stock was issued. The corporation never had any cause of action against these defendants. As between them and the company, the agreement for the issue of the stock was valid. The creditors are not here seeking to enforce a right of action acquired through or from the corporation, but one that accrued directly to themselves, or for their benefit, and that did not accrue at least until the corporation became insolvent, in May, 1884.

Counsel for the St. Paul Trust Company stated that, if the court should reverse the order appealed from on any of the grounds urged by the other appellants, it would not be necessary for us to consider any of the assignments of error peculiar to his appeal; but, as we reverse upon a ground that may be remedied by amendment, we deem it proper to say that, in our opinion, the claim against the Kittson estate is a "contingent" claim, within the meaning of 1878 G. S. ch. 53.

Order reversed.

GILFILLAN, C. J., took no part.

(Opinion published 50 N. W. Rep. 1117.)