Thomson, P. J.,
delivered the- opinion of the court.
In 1895 the Paul Wilson Dry Goods Company was a corporation doing a mercantile business in the city of Pueblo. On the 27th day of February, of that year, this corporation executed a chattel mortgage of all its stock in trade and fixtures to the American National Bank of Pueblo, and Sweetzer, Pembroke & Co., a copartnership, and assigned to the same parties all its book accounts. The mortgage and assignment were made to secure an indebtedness to those parties, aggregating 125,563.31, exclusive of interest. The mortgage, by its terms, authorized the mortgagees to take immediate possession of the stock of goods and fixtures, and sell the same at public or private sale for the purpose of satisfying the indebtedness, rendering and paying the overplus, if any, to the dry goods company. The mortgagees thereupon took possession of the mortgaged property, and caused it to be in *422 ventoried; the inventory showing its approximate value to be $35,059.92. At the time of the transaction the dry goods company was indebted to the John Y. Farwell Company, and Carson, Pirie, Scott & Co., in sums aggregating $7,037.59, and to other parties in a considerable amount. The Wilson Dry Goods Company was in a failing condition, if not absolutely insolvent. After the making of the mortgage and assignment mentioned, the Farwell Company, Carson & Co., and others of the creditors, instituted proceedings in attachment against the dry goods company, and caused the mortgagees to be summoned as garnishees. The Farwell Company and Carson & Co., then brought this action against the mortgagees and the mortgagor, to set aside and cancel the mortgage and assignment, and subject the mortgaged and assigned property to the payment of the claims of the plaintiffs and the other creditors; alleging that the property transferred composed all of the assets of the insolvent corporation; that the value of the property transferred was largely in excess of that corporation’s indebtedness to the mortgagees; that at the time the mortgage and assignment were given, the mortgagees. knew that the mortgagor was insolvent; that the execution of the mortgage and assignment prevented the dry goods company from carrying out the purposes of its incorporation, and had the effect of working a dissolution of the corporation in a manner other than that provided by law; that the indebtedness secured was long past due, and was one for which the stockholders and directors of the company had made themselves personally liable; and that the transaction was the result of a fraudulent collusion between the mortgagor and the mortgagees to hinder and delay the plaintiffs, and other creditors of the mortgagor, in the collection of their just claims.
The property described in the mortgage was sold for $21,000. The nominal value of the book accounts seems to have been something in excess of $14,000. Concerning their real value, what of them were collectible, and what not, and what became of them, the record affords no information. It *423 clearly appears from the evidence that all parties to the transaction acted in good faith; that its sole object was to secure a bona fide indebtedness, for which no personal liability had been incurred by the stockholders or directors; and that there was no improper purpose in the suggestion or consummation of the transaction on the part of any one connected with it. There is therefore no question of actual fraud in the case.
. The sale of the property took place sometime after the complaint was filed, and an attack is made upon it in the replication. In this respect the replication is a departure, and states a cause of action which, if sustained by proof, would entitle the plaintiffs to relief of a nature altogether different from any that could be adjudged to them in the action as it was brought. If by unfair or improper methods the property was sacrificed, the plaintiffs, as creditors, would have just ground of complaint, and in a proper proceeding for the purpose, the defendants might be compelled to account for its actual value. But the object of this suit is the cancellation of the mortgage and assignment, and the question of their validity cannot be affected by anything which took place after their execution. However, so far as this record throws any light on the subject, the sale seems to have been conducted in accordance with the requirements of the mortgage; nothing unfair in its management was made to appear; and there was no evidence from which we would be authorized to infer that the method pursued was not the one calculated to bring the best price at the least expense.
How a transfer, as security, of property of a value much greater than the amount of the debt might affect the transaction as against other creditors, we do not find it necessary now to inquire, because we have before us no data to enable us to judge whether in this case the value of the property transferred was greater than the amount of the debt. The mortgaged goods brought $21,000, some thousands of dollars less than the principal; and whether the book accounts paid, or would have, paid, the residue, or left a surplus after paying the residue, we have no means of forming an opinion.
*424 The main question, however, in the case, and. the one to which the argument on both sides is almost entirely directed, arises on the face of the pleadings. As shown by them, the corporation was insolvent, and the transfer included all of its assets, leaving nothing to be applied to the claims of other creditors, except such surplus as might remain after the mortgage debt was satisfied; and the question is whether,-in view of the financial condition of the corporation at the time, the preference given to the partnership and the bank can be sustained. It has been held by a number of courts that the assets of an insolvent corporation constitute a trust fund for the benefit of all its creditors, and that, therefore, a corporation, being insolvent, has-no power to prefer particular creditors ; and the same doctrine is vigorously and confidently asserted by a distinguished legal author. Hardware Co. v. Manfg. Co., 86 Tex. 143; Shoe Co. v. Thompson, 35 S. W. Rep. (Tex.) 473; Rouse v. Bank, 46 Ohio State, 493; State v. Brockman, 39 Mo. App. 131; 5 Thompson on Corporations, §§ 6492, 6496. This doctrine, in so far as it has been judicially adopted, seems to be the outgrowth of a form of statement, used in some authorities, of a principle which has always been asserted, that corporate property must be appropriated to the payment of corporate debts before there can be any distribution of it among stockholders; and, as between stockholders and creditors, the corporate assets have been denominated a trust fund for the benefit of creditors. Story’s Eq. § 1252; Wood v. Dummer, 3 Mason, 308; Curran v. State of Arkansas, 15 How. (U. S.) 304.
But there is a wide interval between the doctrine that the corporate debts must be paid before distribution to the stockholders, and the doctrine that the insolvent corporation holds its property in trust for the equal benefit of all its creditors ; and there is no logical relation between the one and the other. The right of an insolvent individual to turn over his property to such of his creditors as he may desire to prefer, is not questioned; and the principal reason assigned why an insolvent corporation may not do the same, is that the individual *425 by his act does not destroy himself, but may still acquire property and discharge his obbgations; whereas, when the corporation dispossesses itself of all its property, it becomes dissolved, and ceases to exist, so that unpaid creditors are for all future time remediless; but the force of the argument vanishes when we come to an examination of the assumption on which it rests. The insolvency of a corporation, and the loss of its property, do not, ipso facto, work its dissolution. Its legal powers remain intact; its members who supplied it with capital when it was created, may furnish a new capital, and it may resume business and discharge its debts. There is a possibility of an insolvent individual retrieving his condition, and there is an equal possibility of an insolvent corporation retrieving its condition. Notwithstanding the confident language in which the extreme trust-fund proposition is asserted, the reasoning by which it is sought to be supported does not commend itself to us as sound.
But aside from all this, the weight of authority is that, in the absence of legislative prohibition, a corporation, even though it be insolvent, has the same power to make a distinction between creditors, and give preferences to some over others, that a natural person has. Dana v. Bank of the U. S., 5 W. & S. 223; Wilkinson v. Bauerle, 41 N. J. Eq. 635; Catlin v. Bank, 6 Conn. 233; Hospes v. Manfg. Co., 48 Minn. 174; Morawetz on Corporations, § 802; Beach on Private Corporations, § 358.
That an insolvent corporation must devote its property to the payment of its debts, and that it is not incorrect to call its assets a trust fund to be so applied, we readily concede; but the question raised here is not touched by the concession. If the assets are all applied in payment of some particular debts, to the exclusion of others, they are devoted to the purpose for which the corporation holds them. They are used, as far as they will'go, in payment of its debts ; but if any valid or substantial reason has been advanced for holding that a corporation, any more than a natural person, is bound to make a proportionate distribution of the fund among *426 all its creditors, we have failed to find it, or it has failed to make an impression upon us.
■We think that the law governing cases like this has heen practically settled in this state. In Breene v. Bank, 11 Colo. 97, it was held that the assets of an insolvent corporation do not constitute a trust fund for ratable distribution among all its creditors. It is true that the preference in that case was obtained by the levy of an attachment; and plaintiff’s counsel seeks to draw a distinction between a preference secured by legal proceedings, and one voluntarily given by the debtor, conceding that in the former case the preference would be legal and valid. We are not quite able to understand the logic of the distinction. If the assets are a trust fund, to ratable shares in which all the creditors are entitled, then it is not allowable to one creditor, no matter what means he may employ for the purpose, to secure more than his share, and thus encroach upon the rights of the others; but if the assets are not a trust fund for the benefit of all creditors alike, then, in the absence of fraud, a preference which one may acquire will be upheld whether it is accorded to him voluntarily, or he secures it by legal process. No such distinction is made in tire decisions upon which counsel relies. In Shoe Co. v. Thompson, supra, a creditor sought to secure a preference by an attachment of the insolvent’s property. The court said: “ After the trust attaches, neither the corporation nor the trustees can, by any act of theirs, affect the rights of the creditors; and we think that it necessarily follows that no creditor can, by any act of diligence on Ms part, accomplish that which neither the corporation nor the trustees could do by agreement with Mm.” There are expressions to the same effect in State v. Brochman, supra ; and we are unable to find that any court, whose views on the main question are in harmony with those of counsel, has hesitated, when necessary, to follow this trust fund theory to the extreme logical results. There being, neither on principle nor authority, any difference between the effect of a preference acquired in one way, and the effect of a preference acquired in another, provided the *427 transaction, in each instance, is bona fide, we must regard the decision in Breene v. Bank, as directly applicable to this case. The question as to the extent to which the assets of ah insolvent corporation might be held to be a trust fund for its creditors, was considered by this, court in West v. Hanson Produce Co., 6 Colo. App. 467, and the conclusion reached that they constitute a trust fund only as between creditors and stockholders.
A corporation organized for purposes of trade has the inherent power, in carrying on its business, to use its credit and contract indebtedness. Although the objects for which it is formed must be expressed in the instrument of incorporation, and although it may not engage in enterprises foreign to the purposes for which it was created, or otherwise transcend its legal powers, yet when in the course of its business it contracts an indebtedness, it assumes an obligation, its duties concerning which are governed, not by the provisions of its charter, but-by laws which are applicable alike to corporations and natural persons. In the matter of the conduct of its business, its charter limits and defines its powers, and it must act within those powers; but the liability of both corporations and individuals, on account of indebtedness incurred by them, is regulated by general law. In inquiring how, in a given case, a corporation, solvent or insolvent, may satisfy the demands of its creditors, an investigation of its charter will afford no assistance. We must fall back upon laws to which all persons, natural and artificial, are subject. In respect to an indebtedness, a corporation may not do what an individual may not do; and, on the other hand, whatever an individual may do, a corporation may do. There is no restriction upon the liberty of a natural person, so long as he retains dominion over his property, to pay one creditor in preference to another ; and as the liability of a corporation for its debts is measured by no rule different from that applicable to liabilities of natural persons, a preference in good faith by the corporation cannot be impeached.
The judgment will be affirmed.

Affirmed.