HASTINGS MALTING COMPANY and Others v. IRON RANGE BREWING COMPANY and Others.[1]

June 4, 1896.

Nos. 10,028—(121).

**Manufacturing Corporation—Brewing Company—Stockholders' Liability.**

The general nature of the business of the defendant corporation, as declared by its articles of incorporation, is the manufacture or brewing of lager beer, and selling and disposing of the same, together with such other business as may be incidental thereto. *Held*, that it is exclusively a manufacturing corporation, and its stockholders are not liable for its debts beyond the amount due on their stock subscriptions.

**Stockholders' Liability — Payment in Property — Overvaluation — Fraud.**

A corporation, unless prohibited by some constitutional or statutory provision, may, in good faith, issue paid shares of its stock for the purchase of property at a fair valuation; and in such case both the corporation and its creditors will be bound thereby. But if there is a material overvaluation of the property, to the knowledge of the contracting parties, the transaction is fraudulent as to subsequent creditors of the corporation without notice; and, if it becomes insolvent, the shareholders so paying for their stock will be charged in favor of such creditors with the difference between the real value of the property and the par value of their stock.

**Same—Finding not Sustained.**

Evidence considered, and *held*, that it does not sustain a finding of the trial court to the effect that a sale by the defendant corporation of full-paid shares of its stock for property received by it, at a material overvaluation, was made in good faith, and was not fraudulent as to subsequent creditors.

Appeal by plaintiff and the intervening creditors of defendant brewing company from an order of the district court for St. Louis county, Charles L. Lewis, J., denying a motion for a new trial. Reversed.

*Schmidt, Reynolds & Mitchell*, for appellants.

The corporation was authorized not only to manufacture malt beer, but to sell and dispose of the same, and there is hence a double

[1] Reported in 67 N. W. 652.

liability, as provided by Oswald v. St. Paul Globe Pub. Co., 60 Minn. 82, 61 N. W. 902; First Nat. Bank v. Winona Plow Works, 58 Minn. 167, 59 N. W. 997. There was such overvaluation as amounts to legal fraud. Boynton v. Andrews, 63 N. Y. 94; Hospes v. Northwestern Mnfg. & Car Co., 48 Minn. 174, 50 N. W. 1117; Boulton C. Co. v. Mills, 78 Iowa, 460, 43 N. W. 290; Boynton v. Hatch, 47 N. Y. 225; Douglass v. Ireland, 73 N. Y. 100; First Nat. Bank v. Gustin M. C. M. Co., 42 Minn. 327, 44 N. W. 198; Gogebic Inv. Co. v. Iron Chief Min. Co., 78 Wis. 427, 47 N. W. 726; Thompson, Corp. §§ 1562, 1563. The corporation has no power to issue stock for less than par. Gamble v. Queens County Water Co., 123 N. Y. 91, 25 N. E. 201; Boynton v. Andrews, supra. The effect of this rule is that shareholders who purchase their shares at less than par will, in the event of its insolvency, be liable to make good to its creditors the difference between its par value and the price at which. it was issued to them. Thompson, Corp. §§ 1562, 1566, 1567, 1568; Fogg v. Blair, 139 U. S. 118, 11 Sup. Ct. 476; Upton v. Tribilcock, 91 U. S. 45; McAvity v. Lincoln Pulp & Paper Co., 82 Me. 504, 20 Atl. 82; Bates v. Great Western Tel. Co., 134 Ill. 536, 25 N. E. 521. Stockholders in America are trustees for creditors. Thompson, Corp. § 1573. The shareholder must pay money or money's worth. Thompson, Corp. § 605; Liebke v. Knapp, 79 Mo. 22; Libby v. Tobey, 82 Me. 397, 19 Atl. 904; Marshall Foundry Co. v. Killian, 99 N. C. 501, 6 S. E. 680; Thompson, Corp. §§ 1606, 1607, 1608, 1609; Boynton v. Hatch, supra; Sickels v. Morton, 44 Hun, 623; Marshall Foundry Co. v. Killian, supra; Tallmadge v. Fishkill Iron Co., 4 Barb. 382; Elyton L. Co. v. Birmingham W. & E. Co., 92 Ala. 407, 9 So. 129; Libby v. Tobey, supra; Shickle v. Watts, 94 Mo. 410, 7 S. W. 274; Farmers' Bank v. Gallaher, 43 Mo. App. 482; Boulton C. Co. v. Mills, supra; Douglass v. Ireland, supra; Osgood v. King, 42 Iowa, 478. In the case at bar, where the property was of such a nature that its value was well known and understood, or capable of being estimated, or easily ascertained, and was taken at an exorbitant estimate, it raises the presumption of fraud, and this presumption is conclusive unless it is rebutted by evidence which fully explains it. 23 Am. & Eng. Enc. Law, 860, note 2; Elyton L. Co. v. Birmingham W. & E. Co., supra; Douglass v. Ireland, supra; Jackson v. Traer, 64 Iowa, 469, 20 N. W. 764; Boynton v. Hatch, su-

pra; Chisholm Bros. v. Forny, 65 Iowa, 336, 21 N. W. 664; New Castle N. Ry. Co. v. Simpson, 21 Fed. 533; Libby v. Tobey, supra; Boulton C. Co. v. Mills, supra; National Tube Works Co. v. Gilfillan, 26 N. E. 538.

*White & McKeon*, for respondents.

In the absence of a stock subscription or of a statute upon the subject, persons receiving full paid shares of a company for property accepted at an over-valuation cannot be held liable by the corporate creditors for the difference between the real value of the property and the valuation at which the company agreed to accept it. Boynton v. Hatch, supra; Boynton v. Andrews, supra; Van Cott v. Van Brunt, 82 N. Y. 535; Schenck v. Andrews, 57 N. Y. 133; Ross v. Kelly, 36 Minn. 38, 29 N. W. 591, and 31 N. W. 219; Phelan v. Hazard, 5 Dill. 45, Fed. Cas. No. 11,068; Coffin v. Ransdell, 110 Ind. 417, 11 N. E. 20; Coit v. North Carolina G. A. Co., 14 Fed. 12, 119 U. S. 343, 7 Sup. Ct. 231; Bank v. Alden, 129 U. S. 372, 9 Sup. Ct. 332; Peck v. Coalfield Coal Co., 11 Ill. App. 88.

START, C. J. This action was brought by the plaintiff, on behalf of itself and all other creditors, against the defendant corporation and its stockholders, to enforce their alleged constitutional liability for the corporate debts, and to collect, and apply in payment of the claims of creditors, an alleged unpaid balance due upon the stock of the defendant stockholders; that is, the difference between the par value of their stock and the actual value of the property transferred to the corporation in full payment of stock issued to them. The defendant stockholders, by their answer, denied all liability in the premises. The trial court, on its findings of fact, ordered judgment for the defendants, and the plaintiff appeals from an order denying its motion for a new trial.

The material findings of the trial court are, in substance, as follows:

Defendant Iron Range Brewing Company is a corporation duly organized and existing under and by virtue of the laws of the state of Minnesota, and was organized and its nature of business was as set forth in its articles of incorporation, as follows: "The general nature of the business of this corporation shall be the manufacture or brewing of lager beer and other malt liquor, and to sell and dispose of the

same, together with such other business as may be incidental thereto." It was so incorporated on or about June 22, 1892; and, by its articles of incorporation, the time for commencement of its incorporation was and is July 1, 1892, and to continue for a period of thirty years. By its articles of incorporation, the capital stock was fixed at $30,000, divided into 600 shares of $50 each. On July 1, 1892, on the day of the date of incorporation, Michael Fink, Catherine Fink, and the defendant Philip M. Graff were partners, under the firm name of M. Fink & Co., and were the owners of a brewery property at Tower, Minnesota, including all the personal property and paraphernalia, machinery, and manufactured stock and material on hand, good will, and trade secured for the business of such brewery, which property was on that date of the actual worth and value of $18,000. On that day, the firm of M. Fink & Co. sold and transferred the property to the defendant Iron Range Brewing Company, and there were issued to them, in consideration of the transfer, the 600 shares of the capital stock of the corporation as fully paid up, as follows: 588 shares to the defendant Philip M. Graff; 8 shares to the defendant Finley H. Frisbee; 2 shares to the defendant Robert P. Paine; 2 shares to Michael Fink. No other consideration was given for the stock, and no other payments were ever made thereon. The stock was so issued on July 1, 1892, and the parties named are the owners and holders thereof, and have ever since been the owners and holders thereof. The sale of the stock to the defendants in consideration of the property was made in good faith by the defendants, and without any intent to defraud or deceive any of the plaintiffs in this action, or any prospective creditor of the corporation. The defendant corporation is insolvent, and, before the commencement of this action, the plaintiff recovered judgment against it for the amount of its claim, and execution was duly returned unsatisfied. Other creditors have become parties to this action, and have proved their claims. The debt of the plaintiff and of all of the creditors was contracted after such stock was issued as fully paid.

1. The plaintiff's first claim is that the defendant corporation is not a manufacturing corporation, and therefore its stockholders are liable for the corporate debts to the amount of their stock. Its articles of incorporation show that it is a manufacturing corporation. This is apparent on a mere inspection of them. They only authorize the corporation to engage in the business of manufacturing lager beer and other malt liquors, and selling the same, together with such other business as may be incidental thereto. The entire business which the corporation is authorized to engage in is manufacturing, disposing of its product, and such incidental business as may be reasonably necessary for effectuating the purposes of its organization. The case of First Nat. Bank of Winona v. Winona Plow Co.,

58 Minn. 167, 59 N. W. 997, is not in point, for in that case the corporation was authorized to purchase and sell plows and farming implements, as well as to manufacture them.

2. Are the findings and conclusion of the trial court, to the effect that the sale of the property in this case to the corporation for paid-up stock was made in good faith, without any intent to defraud creditors, and that it cannot therefore be questioned by them, sustained by the evidence? This is the real question in the case, and we answer it in the negative.

The question as to the liability of stockholders who have received full-paid shares of a corporation without in fact having paid in full for them, or who have received them in exchange for property at an overvaluation, to subsequent creditors of the corporation, is one upon which the adjudged cases are in conflict. In some of the cases the conflict is apparent only, for the diversity in the conclusions reached is the result of a difference in the statutes under which the corporations were organized; but all of the cases cannot be thus reconciled. We are, however, relieved from any extended discussions of the law of this case by reason of the principles laid down in the previous decisions of this court.

In the case of First Nat. Bank of Deadwood v. Gustin M. C. M. Co., 42 Minn. 327, 44 N. W. 198, it was held that where the stock of a corporation was issued as fully paid up, without in fact having been paid to its full par value, equity will hold the shareholders liable for the amount not actually paid, in favor of creditors who can be presumed to have given credit to the corporation in reliance upon its apparent paid-up capital. The matter was further examined and fully discussed in the case of Hospes v. Northwestern Mnfg. & Car Co., 48 Minn. 174, 50 N. W. 1117, wherein it was held that the right of creditors to compel holders of stock not paid for to pay for it, contrary to their agreement with the corporation, rested neither on implied contract nor upon the "trust fund" doctrine, but upon the ground of fraud. The rule and the reason for it, as stated in the opinion, are substantially that the capital of a corporation is the basis of its credit, and a substitute for the personal liability of those who own its stock. People deal with the corporation and give it credit on the faith of its stock, and they have a right to assume that it has a paid-in capital to the amount which it represents itself as

having. If the representation is false, it is a fraud on creditors; and, in case the corporation becomes insolvent, equity will compel the holders of bonus stock, or stock not in fact paid in full, to make the representation good, by paying the balance due on their stock to the extent necessary to pay creditors whose debts were contracted subsequent to the issuing of the stock as fully paid, and who are presumed to have relied on the representation. It is the misrepresentation of fact in stating the amount of capital to be greater than it is in fact which is the basis of the liability of the stockholders in such cases.

In principle, it can make no difference whether the stock issued as paid up is bonus stock, pure and simple, or whether it was sold for cash for less than its par value, or for property at a gross overvaluation. In the first two cases the question of fraud would be one of law, for on the issuing by the corporation of its stock as paid, and its acceptance by the stockholders, when in fact nothing was ever paid for it, or where a sum of money less than its par value was paid and accepted for it, there is no opportunity for a mistake or error of judgment; and such stockholders cannot be heard to say, after creditors have trusted the corporation on the basis of its apparent paid-up capital, and the corporation has become insolvent, that they acted in good faith, without any intention to defraud any creditor. The law presumes an intention in such cases to defraud. Where property at a gross overvaluation is given and accepted for paid-up stock, the question of fraud is usually one of fact. But there may be cases where the property was of such a character, and the overvaluation so great, as to exclude any possibility of an honest mistake. In such cases it would be the duty of the court to declare the transaction fraudulent as to creditors. Upon principle and authority, we hold that a corporation, unless prohibited by some statutory or constitutional provision, may in good faith issue paid-up shares of its stock for the purchase of property at a fair valuation; and in such case both the corporation and its creditors will be bound thereby. But if there is a material overvaluation of the property, to the knowledge of the contracting parties, the transaction is a fraud as to subsequent creditors of the corporation without notice; and, if it becomes insolvent, the shareholders so paying for their stock will be charged, in equity, to the extent necessary to

pay such creditors, with the difference between the real value of the property and the par value of their stock.   Hospes v. Northwestern Mnfg. & Car. Co., 48 Minn. 174, 50 N. W. 1117;  2 Morawetz, Priv. Corp. § 825;  Taylor, Corp. § 545;  23 Am. & Eng. Enc. Law, 858.

In the practical application of this rule, it must be kept in mind that fraud, actual or constructive, is the basis of the stockholders' liability to the creditor.   On the one hand, the value of the property is to be determined, not from subsequent events, but as of the time of the transaction, and from the situation, nature, and condition of the property as they honestly appeared to the parties at the time.   Although there was in fact an overvaluation of the property, it will not render the stockholders liable for the deficiency if it was the result of an honest mistake or error of judgment.   On the other hand, where the nature and condition of the property are such that its value is well known and understood, or is capable of being readily estimated and ascertained, and the property is transferred to the corporation at a gross overvaluation for paid-up shares, the transaction is prima facie fraudulent as to subsequent creditors, and as against them the burden is upon the shareholder to rebut the presumption by clear and satisfactory evidence.   If he knew or ought to have known that he was paying for his stock in property at a material overvaluation, it will not be sufficient for him to show, as a mental operation, that he did not intend to defraud any one.   He must go further, and show that, in the exercise of ordinary business sense, he was justified in believing, and did honestly believe, that the property was being turned in at a fair valuation.   Where the facts are undisputed, and the overvaluation so great as to show that the stockholder ought to have known it if he had exercised ordinary business prudence, his actual belief or intention in the premises will not avail him; he will be presumed to have intended the reasonable and natural consequences of his act, which is to defraud creditors in case of the insolvency of the corporation.

An examination of the evidence in this case in the light of these suggestions shows that the finding of the trial court, to the effect that the sale of the property in question to the corporation for paid-up shares of its capital stock was made in good faith, is manifestly against the evidence.

The value of the property at the time of the transaction, as found by the court, was only $18,000. This, under the evidence, was a very liberal estimate. The title of the property was originally in the name of the firm, M. Fink & Co.; yet, for all practical purposes, the defendant Graff was the owner of it, for he was a member of the firm, and had furnished the money which built the brewery, and bought the property sold to the corporation. The building of the brewery was commenced in the fall of 1891, and in June, 1892, shortly after the brewery was completed and equipped for business, the real owner of the property entered into an agreement with three other persons, who were without capital, so far as appears, to organize a corporation to purchase the property for the stock of the corporation. The corporation was organized by these persons with a capital of $30,000. Paid-up stock to the amount of $30,000 was then issued by the corporation in payment of the property, which was worth only $18,000; that is, the property was taken by the corporation at an overvaluation of $66\frac{2}{3}$ per cent., or, in other words, the stock was issued as paid up for property worth 40 per cent. less than the par value of the stock. The property, was of such a nature that its real value could be readily estimated and ascertained. The building had been erected, and the machinery, fixtures, and appliances of the business purchased, only a short time previously. Under these circumstances, the overvaluation was so gross as to raise, unexplained, a conclusive presumption of fraud, and justify the conclusion that the transaction was not bona fide, but a mere device to obtain paid-up stock for not more than 60 per cent. of its par value,—a stock-watering scheme.

It would seem that the corporation and the defendant Graff knew, or must have known, that the property was turned in at a very material overvaluation. To assume that he did not know this would be an impeachment of his intelligence. The burden, then, rested on him to rebut the presumption of fraud by clear and satisfactory evidence. We are of the opinion that he failed to do so. He testified that he put into the property $20,000 to $24,000; that it was considered reasonably worth $30,000; that it was worth that sum; and that there was no intent or thought of fraud on his part or of the corporation. He also testified that the land on which the brewery stood was put in at $3,000, and was worth it, but admits that it was

donated practically to his firm. On his examination, he testified with reference to the cost of the property as follows:

"Q. Have you the ledger, daybook, journals, or any other book belonging to this corporation? A. I have not. Q. Where are they? A. They are at Tower, I presume. Q. You knew of the fact that you were required to produce them here, did you not? A. I did not, sir. Q. Your attorney was aware of that? By Mr. White: We did not have them. The assignee had them. He held the accounts. By Mr. Schmidt: Q. How much did you pay Mr. Fink for that ground? A. I couldn't tell you now. Q. Do you know how much you paid for putting up the so-called 'cellar,'—the ice house? A. No, sir; I do not. Q. Do you know how much you paid for putting up the brewery property itself? A. No; I do not. Q. Who did you buy the machinery of? A. The machinery was bought indirectly from some brewing company down at Minneapolis. Q. It was bought secondhand? A. Part of it. The man told me it was worth $3,000, but we got it for less than that, I think. I don't recall the exact amount. Q. You paid $1,800 for it? A. I don't remember the exact price. Q. Isn't that the exact price? A. I don't remember. Q. Isn't that about it? A. I don't recall the exact price. I know the man told me it was worth $3,000. Q. Is it not a fact that you bought it for $1,800? A. It was just as good as new. Q. And you paid $1,800? A. I don't remember without refreshing my memory from the book. Q. Now, that brewery building itself is an ordinary barn building, isn't it? A. It is an ordinary building, but it cost as much as a brick building. Q. You don't know how much it did cost? A. I know it cost me $24,000, the whole business. Q. It was running at a loss? A. No, sir; only at the very latter part, when the bookkeeper stole everything. Q. You had a bookkeeper in there that stole $3,000? A. Yes; he stole something like that. Q. That is included in the $24,000? A. I put it all in— I suppose that is where part of it went. Q. So there was $3,000 that the bookkeeper got away with, and that you put in? A. I furnished all the money that went in. Q. Now, Mr. Graff, prior to the time that you actually incorporated, how much money had you actually put into that property? A. Over $20,000."

There was no other witness on the part of the defense as to the value of the property or the good faith of the transaction. Any comment on the defendants' evidence would seem to be unnecessary. It cannot be held to rebut the presumption of fraud arising from the known gross overvaluation of the property. It is suggested on behalf of the defendants that the transaction was spread out on the records of the corporation, and, if subsequent creditors had examined the records before trusting it, they would have ascertained just the consideration paid for the stock. As to third parties, the record books of a corporation are private, and such persons are not charged

with knowledge of matters therein recorded. Creditors were not bound to examine the record books of the defendant corporation before trusting it, and such records are not notice to them. Wetherbee v. Baker, 35 N. J. Eq. 501.

Order denying a motion for a new trial is reversed, and a new trial granted.