THOMAS WALLACE v. CARPENTER ELECTRIC HEATING MANU-
FACTURING COMPANY and Another.[1]

December 3, 1897.

Nos. 10,815—(149).

**Insolvency of Corporation—Watered Stock—Liability of Stockhold-
ers—Hastings v. Iron Range, 65 Minn. 28, Followed.**

*Held,* following Hospes v. Northwestern, 48 Minn. 174, and Hastings v.
Iron Range, 65 Minn. 28, that the original holders of bonus or watered
stock of a corporation issued as paid up and their transferees with notice,
will, in case of the insolvency of the corporation, be charged, in favor of
a creditor who became such after the stock was issued, with the difference
between the par value of the stock and the amount paid the corporation
therefor to the extent necessary to satisfy the creditors' claims.

**Same—G. S. 1894, § 3415—Sale of Stock Below Par.**

G. S. 1894, § 3415, construed, and *held* that it does not authorize a man-
ufacturing corporation or any other to issue its stock as fully paid up,
and sell the same for less than par, and on such terms as its directors
deem advisable.

**Same—Action by Creditor—Burden of Proof.**

In an action by a creditor to collect his judgment against an insolvent
corporation from the holder of bonus or watered stock issued as paid up,
the burden is on such holder to show that he acquired his stock bona fide
without actual notice of the facts making its issue fraudulent as to the
creditor, or that he purchased his stock from a bona fide transferror.

**Same—Findings Warrant Equitable Relief.**

*Held,* that the facts found by the trial court entitle the plaintiff herein
to the equitable relief asked.

Action in the district court for Ramsey county against the Car-
penter Electric Heating Manufacturing Company and the American
Electric Heating Corporation to ascertain and enforce the liability
of the Heating Corporation for unpaid instalments on the stock
of the Manufacturing Company owned by it, in case the Heating
Corporation failed to pay a judgment in favor of plaintiff against
the Manufacturing Company amounting to $5,587.71. From a judg-
ment dismissing the action, entered pursuant to findings and an
order of Otis, J., plaintiff appealed. Reversed.

[1] Reported in 73 N. W. 189.

70 M.—21

*W. S. Dwinnell,* for appellant.

The capital stock of a corporation must be paid for in money or money's worth, and any attempt to issue it otherwise is a fraud upon creditors. Hastings v. Iron Range, 65 Minn. 28; First National v. Gustin, 42 Minn. 327; Hospes v. Northwestern, 48 Minn. 174; Rogers v. Gross, 67 Minn. 224. By the construction of the lower court G. S. 1894, § 3415, is in derogation of the common law, which requires capital stock to be, in fact, fully paid. 2 Morawetz, Priv. Corp. § 825; Taylor, Priv. Corp. § 545; 23 Am. & Eng. Enc. 858. If it was intended to depart from the common law, it should clearly so appear from the terms of the statute, as in section 2832, relating to mining corporations, which provides that "no stock so issued or sold, purporting to be full-paid, shall be subject to any further assessment in the hands of the lawful holder thereof without his consent." There is no such language in section 3415, hence the legislature did not intend it should have such a construction.

The burden of proof is on respondent to show itself a bona fide purchaser. The purchaser of a stock certificate, silent on its face whether it is full-paid or not, takes it without any presumption as to full payment. If such purchaser makes no inquiry as to whether the certificate is full-paid he cannot claim, when his stock is subsequently assessed by the company, that the certificate is full-paid as to him and that he is an innocent holder of full-paid stock. Such purchaser takes the stock subject to all burdens then attaching to it whether in favor of the corporation or of its creditors. If there are unpaid assessments he must pay them when called upon, or if the assessments are collectible by the creditor he must pay them to the creditor. Hence, in the absence of direct representations, there is no presumption whether the stock is full-paid or not. A purchaser takes it charged with knowledge of the facts relating to its issue and payment. Our practice shows the correctness of this reasoning. A company undertaking to collect an assessment shows that there are assessments unpaid and that the defendant is a stockholder. This makes a prima facie case. If defendant asserts representations were made to him by the company leading him to believe the stock full-paid, that becomes defensive matter to be affirmatively proved by him. Likewise if defendant asserts he bought

his stock from one to whom such representations were made. In this case respondent is shown to be a stockholder and that its stock was not full-paid. This makes a prima facie case. If it wished to defend on the ground that the company represented to defendant or its vendor that the stock was full-paid, it should have affirmatively proved it.

Capital stock is not negotiable paper in the sense that a person takes it free from the equities of the corporation. 2 Thompson, Corp. §§ 1682, 2353; Hammond v. Hastings, 134 U. S. 401; Young v. South, 85 Tenn. 189; President v. New York, 13 N. Y. 599; Hawes v. Gas Consumers, 9 N. Y. Supp. 490; Upton v. Hansbrough, 3 Biss. 417.

We know of no case where the evidence as to overvaluation is so plain as in the case at bar, and, as the supreme court of Iowa said in the case of Boulton v. Mills, 78 Iowa, 460, parol testimony as to the value of assets turned over in payment for stock will not be received to rebut the facts as set forth in the corporate records. See, also, Hastings v. Iron Range, 65 Minn. 28.

The respondent cannot claim to be an innocent holder of full-paid stock. Boulton v. Mills, supra; Bailey v. Pittsburg, 69 Pa. St. 334; Boynton v. Hatch, 47 N. Y. 225; Northwestern v. Prior, 68 Minn. 95. When a stockholder undertakes to escape liability on the ground that he is an innocent purchaser, the burden is on him to show the fact. Upton v. Tribilcock, 91 U. S. 45; Upton v. Hansbrough, supra; Keystone v. McCluney, 8 Mo. App. 496; Young v. Erie, 65 Mich. 111.

*Otto Kueffner,* for respondent.

There are two kinds of obligations to pay for stock, not paid for dollar for dollar when issued. The first is a contractual obligation of the stockholder towards the corporation to pay for the stock or any unpaid instalment thereof, and is referred to in G. S. 1894, § 2600, subd. 1. The second is the equitable obligation enforced by the courts in favor of a creditor on the ground of fraud or misrepresentation. In order to give the court jurisdiction, the creditor must show equitable grounds. He must show that he is a bona fide creditor for value and without notice. Hospes v. Northwestern, 48 Minn. 174, 197; First National v. Gustin, 42 Minn. 327;

Hastings v. Iron Range, 65 Minn. 28. He must then show that a fraud has been committed by the corporation and the stockholder, such as the issue of fictitious or watered stock, or that the stockholder received his stock for property grossly overvalued and that he knew it was overvalued. In order to invalidate stock issued for property taken at an overvaluation, it must be shown not only that there was an overvaluation, but that it was intentional and therefore fraudulent. Cook, Stockh. § 47; Coit v. Gold, 119 U. S. 343; Kelley v. Fletcher, 94 Tenn. 1; Coffin v. Ransdell, 110 Ind. 417; Phelan v. Hazard, 5 Dill. 45; American v. Hayes, 30 Atl. 936; Handley v. Stutz, 139 U. S. 417; Streator v. Rankin, 45 Ill. App. 226; Clark v. Bever, 139 U. S. 96. A corporation may market and sell its stock for the best obtainable price without a trust arising in favor of creditors. Handley v. Stutz, supra; Van Cott v. Van Brunt, 82 N. Y. 535; Steacy v. Little Rock, 5 Dill. 348, and cases cited. Foreman v. Bigelow, 4 Cliff. 508; Johnson v. Lullman, 15 Mo. App. 55; Keystone v. McCluney, supra; Burkinshaw v. Nicolls, L. R. 3 App. Cas. 1004.

G. S. 1894, § 3415, as it now stands, was in force at the time of the organization of this corporation, May, 1891. The original law of 1866 forbade the issuance of fully paid-up stock, except for an equivalent in money or money's worth, unless the corporation was expressly authorized to do so by a special clause in its charter or articles of incorporation. The amendment of 1867 expressly excepted railroad, navigation and manufacturing corporations from this limitation and specially empowered and authorized their boards of directors to issue full-paid stock whenever they might deem it advisable; the directors of the Carpenter Company followed this proviso. G. S. 1894, c. 34, tit. 2, § 2832, grants similar privileges to mining corporations. This section was construed by this court in Ross v. Kelly, 36 Minn. 38.

Even in equity in cases of conflicting evidence the supreme court will defer to the findings of the trial judge. Erskine v. Lowenstein, 82 Mo. 301.

START, C. J.

This is an equitable action by a judgment creditor to enforce payment of his judgment by a stockholder of the debtor corporation

on the ground that its stock was fraudulently issued as fully paid up, when in fact it was not.

The material facts, as found by the trial court, are substantially these: The plaintiff on October 31, 1895, recovered judgment for $5,587.71 against a corporation of this state known as the "Carpenter Electric Heating Manufacturing Company," which will be designated as the "Carpenter Company." The judgment has never been paid. The capital stock of the defendant Carpenter Company was $400,000, divided into 4,000 shares of the par value of $100 each. Prior to the recovery of such judgment the other defendant herein, the American Electric Heating Corporation, which will be designated as the "American Company," purchased and became and now is the owner of 3,946 shares of the stock of the Carpenter Company, and immediately thereafter the latter sold all of its assets for full value to the American Company. Shortly prior to May, 1891, a third corporation, which for brevity we designate the Nevins Company, then owning certain letters patent upon devices used in manufacturing electric heating apparatus, entered into a written contract with George H. Finn, whereby the Nevins Company granted to Finn and his assigns the exclusive right to manufacture and sell, and also the right to sell to others the right to use, this patented device; also all other like patented devices the Nevins Company might thereafter acquire.

In consideration of this grant, Finn agreed to pay to the Nevins Company a royalty of 25 per cent. of the list prices of all goods manufactured thereunder. He also agreed to organize a corporation for the manufacture of such devices, with a nominal capital stock of $400,000, to which corporation he would transfer the license so obtained, and pay such corporation $5,000 for developing the devices and carrying on the business of such corporation, for which he or those named by him should receive 1,500 shares of the full-paid capital stock of the new corporation, and cause 1,000 other shares of such stock to be issued and delivered to the Nevins Company. The remaining 1,500 shares of stock were to be held in trust and sold for the benefit of the corporation.

Finn, pursuant to such contract, organized the Carpenter Company in May, 1891, and immediately upon its organization paid to

it $5,000, and transferred to it all the rights acquired by him under his contract with the Nevins Company, and in consideration thereof the Carpenter Company issued to Finn 4,000 shares of its capital stock, purporting to be full-paid stock, upon condition that he should transfer 1,000 shares thereof to the Nevins Company, and 1,500 shares to a trustee, to be held and known as "treasury stock," and sold for the benefit of the corporation issuing it. He so transferred the 1,000 shares and the 1,500 shares, and received and retained for himself and associates the remaining 1,500 shares of this stock. The 1,500 shares of treasury stock were sold for the benefit of the Carpenter Company for $25,000, and no more. Other than as here stated, no consideration was paid to the Carpenter Company for the 4,000 shares of its capital stock. The value of the license and right so transferred by Finn to the Carpenter Company was at the time worth no more than he had so agreed to pay therefor.

The defendant the American Company, when it acquired the title of the 3,946 shares of the Carpenter Company stock, had full notice and knowledge of the circumstances under which the original 4,000 shares of stock were issued, and the consideration paid therefor; but it did not appear that the American Company acquired title to any of this stock from the persons who originally took the same, except the 1,000 shares transferred to the Nevins Company in payment of the license, nor did it appear that any of the parties other than the Nevins Company, from whom the American Company acquired its stock, had any knowledge of the facts under which the 4,000 shares were originally issued, or that they did not in good faith believe that such shares of stock were paid for in cash at their par value when issued. This negative statement of what did not appear inserted by the trial court in its findings of fact, interpreted in the light of the evidence, means simply this: that neither party offered any evidence as to whether or not the parties, except the Nevins Company, from whom the American Company acquired its shares of stock, were or were not bona fide purchasers of the stock for value, without any notice that it was not in fact fully paid for when it was originally issued.

Upon these facts, the trial court, as a conclusion of law, held that the plaintiff was not entitled to any relief, and that the action be dismissed. Judgment was so entered, from which the plaintiff appealed.

The decision of the trial court was based upon two grounds: (a) That G. S. 1894, § 3415, authorizes a manufacturing corporation to issue its stock as full paid, and dispose of it at less than par and on such terms as its directors deem advisable. (b) That, although the defendant the American Company had notice of the circumstances under which its stock was originally issued and the consideration paid therefor when it purchased the stock, yet, if it acquired the stock from bona fide purchasers, the latter would be protected, and their equities would inure to the benefit of the American Company, and it would also be protected. This last ground necessarily implies that the burden of proof was upon the plaintiff to show that the transferrors of the American Company were not bona fide purchasers of the stock, for there was no finding or evidence that they were such.

If either of the reasons are good, it follows that the trial court's conclusion of law is sustained by the facts found; but, if both are untenable, such facts do not sustain the judgment rendered.

1. The respondent, however, does not concede this, but claims that the trial court found that the stock of the Carpenter Company was paid for in full when issued; that the plaintiff failed to show any fraudulent issue of stock or overvaluation of the property taken in payment of it; that the trial court refused to find any fraud.

If these claims are justified by the record, the judgment in this case is right, whether the reasons assigned by the court for its decision are correct or not.

The finding of the court was that the stock was "issued as purporting to be full-paid stock," not that it was in fact fully paid for. While the court did not find in express words that there was a fraudulent issue of stock as to creditors of the corporation, and an overvaluation of the property received in payment of the stock, it found the facts from which such a conclusion necessarily and legally follows.

It expressly found that the license and rights transferred to the

Carpenter Company by Finn were worth no more than he agreed to pay therefor. He agreed to pay $5,000 therefor, and cause 1,000 shares of stock of the corporation to be organized (the Carpenter Company) to be issued to the Nevins Company as fully paid up. Hence the Carpenter Company received only $5,000 for the $150,000 of stock issued to Finn, and he never paid in money or property any greater sum therefor, and for the $150,000 of treasury stock the corporation received only $25,000; that is, for $300,000 of its stock the Carpenter Company received only $30,000, or an average of $10 per share, and for $100,000 of its stock it received the exclusive right to manufacture and sell the devices covered by the patent by paying a royalty of 25 per cent. of the list prices of all goods manufactured. It commenced business by falsely and intentionally representing to the commercial world that it had a paid-up capital of $400,000, when, taking the most favorable view for the corporation of the admitted facts, it had been paid only $130,000 in money and property for the whole of its stock, or less than one-third of its par value. Upon the facts found by the trial court it is idle to claim that the issuing of the stock of the Carpenter Company as paid up was an honest transaction. There was no room for any honest mistake of judgment in the premises. It was upon the facts found from its inception a gross fraud, as a matter of law, unless it was expressly authorized by the statute.

While the precise date when the plaintiff's debt was contracted was not found by the court, yet it necessarily follows, from the finding of the court that the whole stock was issued as purporting to be fully paid immediately upon the organization of the corporation, that the plaintiff's debt was contracted after the stock was so issued. The findings of fact, then, bring this case within the principles laid down in the former decisions of this court, and the plaintiff is equitably entitled, to the extent necessary to pay his judgment, to charge the American Company with the difference between the par value of its stock and the amount paid the Carpenter Company therefor. Hospes v. Northwestern, 48 Minn. 174, 50 N. W. 1117; Hastings v Iron Range, 65 Minn. 28, 67 N. W. 652.

2. This brings us to the question whether G. S. 1894, § 3415, authorizes, as respondent claims, manufacturing and other corpora-

tions to issue their capital stock as paid up when it is not in fact. The section reads thus:

"Corporations having capital stock divided into shares, unless specially authorized, shall not issue any shares for a less amount to be actually paid in on each share than the par value of the shares first issued: provided, that railroad and navigation and manufacturing corporations, and corporations for buying, holding, improving, selling and dealing in lands, tenements, hereditaments, real, mixed and personal estate and property, created or organized under this chapter, or under any charter or special act of incorporation heretofore passed, shall have power to create, issue and dispose of such an amount of special, preferred or full-paid stock of the capital stock of such corporation as may be deemed advisable by the board of directors of such corporation: provided, that any corporation may, by its articles of incorporation or by any amended article of its articles of incorporation, provide for special, preferred and common stock, or special or preferred and common stock, of the capital stock of such corporation; and any corporation heretofore or hereafter organized without changing its articles of incorporation may issue its capital stock as a part special and a part preferred and a part common, or a part common and a part either special or preferred, by direction of its board of directors, when so authorized by a majority of its stockholders at its annual meeting or at a meeting called for that purpose; and said board of directors, when so authorized by said meeting of said stockholders, may give such preference as it may deem best to such special or preferred stock, or such special and preferred stock."

So much of this statute as precedes the first proviso is the original section, as enacted by G. S. 1866, c. 34, § 163. The first proviso was enacted by Laws 1867, c. 18, § 2, and amended by Laws 1887, c. 49. The second proviso was added by Laws 1891, c. 71.

It is claimed by the respondent that the effect of the proviso is to take corporations therein mentioned out of the operation of the statute as it was originally enacted, and that the section as it now stands authorizes such corporations to issue their stock as full paid, and dispose of the same for less than par and on such terms as their board of directors may deem advisable; that is, that the statute authorizes such corporations to issue fictitious stock and thereby obtain a false credit.

A certificate for paid-up shares in a corporation is simply a written statement in the name of the corporation that the holder thereof

is a stockholder, and that the full par value of his shares has been paid to the corporation. If the shares in fact have not been so paid for, the certificate that they have been is a false representation that the assets of the corporation have been increased to the amount of the par value of the stock so issued. And when a corporation represents that it has a paid-up capital of a given amount, it represents to the business world that at the time it issued the stock it received money or property to the full par value of its stock. The issuing of the stock of a corporation as paid up when it is not so in fact is a public and a private wrong,—a cheat and a fraud,—which enables the corporation to obtain credit and property by false pretenses.

Ethically, the legislature might with the same propriety authorize an individual to misrepresent his assets for the purpose of obtaining credit as to authorize a corporation, other than a mining corporation, to issue watered stock. Therefore, while the meaning of this statute is not entirely clear, it ought not to be construed, unless the express language used leaves us no other alternative, so as to impute to the legislature an intention to legalize a practice denounced by courts and text writers as immoral, contrary to public policy, and illegal independent of any statute prohibiting it.

The only basis for claiming that this statute authorizes the issuing of paid-up stock contrary to the fact is that the proviso is an exception to the prohibition against issuing any stock unless fully paid; hence it is urged that no effect can be given to the proviso unless it legalizes the issuing of stock as paid in full when it is not. The language of the proviso is:

"Shall have power to create, issue and dispose of such an amount of special, preferred or full-paid stock  *  *  *  of such corporation as may be deemed advisable by the board of directors of such corporation."

If the words "full paid" were omitted from the proviso, would it leave the proviso without effect,—a nullity? Clearly not, for the meaning would then be clear. The proviso then would authorize the corporation to create, issue and dispose of such an amount as its directors deemed advisable of special or preferred stock; that is, stock having a preference or special rights over the other stock of

the corporation. The proviso with the words "full paid" omitted, taken in connection with the statute to which it was added, would not be susceptible of any reasonable construction except that it authorized the creation and sale at not less than its par value of special and preferred stock. Restore the omitted words to the proviso and read the statute as a whole and its meaning is precisely the same.

The purpose of the proviso was to authorize the creation and sale of special or preferred stock. The proviso does not assume to deal with the price at which the stock authorized to be issued may be sold. That was already provided for by the original statute which required the price to be not less than par. It does, not, by its language or necessary inference, authorize the directors to dispose of any of the stock on such terms as they deem advisable; but the sole authority is to create, issue and dispose of such an amount of paid-up, special or preferred stock as they deem advisable. This is the proper construction of the statute.

There is no suggestion in the statute that stock of any class may be issued as paid up if it is not so in fact. The language is "full-paid stock"; that is, stock which has been paid for at its full par value. The second proviso to this statute, in which the words "full paid" are omitted, is a legislative construction of the first proviso, for it deals with the subject of issuing special or preferred stock, omitting the words "full paid."

Our conclusion that G. S. 1894, § 3415, does not authorize, but forbids, the issuing of stock by the corporations therein named as fully paid up when such is not the fact, is supported by the cases of Hastings v. Iron Range, 65 Minn. 28, 65 N. W. 652, and Rogers v. Gross, 67 Minn. 224, 69 N. W. 894. In the first case cited it was expressly held that the corporation was exclusively a manufacturing corporation, and the question was directly involved as to the liability to creditors of stockholders who received their stock as fully paid when such was not the fact; and the conclusion reached is based upon the proposition that a manufacturing corporation was not authorized to issue its stock as paid up when it was not in fact. It is true, however, that this proviso to the statute invoked in this case was not referred to or discussed by counsel or court in either

of the cases cited; hence we have treated the question as an open one.

3. The last reason urged in support of the conclusion of law of the trial court is that no evidence was offered to show that the defendant the American Company did not purchase its stock of parties who were bona fide purchasers without notice; hence it does not appear that the plaintiff's equities are superior to those of the defendant.

This places the burden of proof on the wrong party. If the defendant purchased of a bona fide transferror it knows that fact better than any one else. A certificate of shares in a corporation is not negotiable paper. But the weight of authority seems to be to the effect that where the equities of a creditor of a corporation come in conflict with those of a bona fide purchaser without notice of the shares of the corporation issued as paid up when such is not the fact, the equities of the latter will prevail.

It is not necessary in this case to decide this question, for all of the authorities agree that a purchaser who acquired his shares of watered stock with notice of the facts as to their issue is liable to the creditors of the corporation to the same extent as the original subscriber. 2 Morawetz, Priv. Corp. § 824; 2 Thompson, Corp. § 1685; 1 Cook, Stockh. § 49. If the defendant's transferror was a bona fide purchaser and the defendant wished to assert his equity to defeat that of the plaintiff, the burden was clearly upon it to establish the equity. Such would be the case even if certificates of stock were negotiable paper. Cummings v. Thompson, 18 Minn. 228 (246); Merchants v. Luckow, 37 Minn. 542, 35 N. W. 434; Bank v. Richter, 55 Minn. 362, 57 N. W. 61.

The defendant neither by its answer nor evidence asserted or even suggested that its transferror was a purchaser without notice. On the contrary, it denied in its answer that it ever owned or held any of the stock of the Carpenter Company. The court then cannot, for the purpose of defeating the equities of the plaintiff, assume without evidence that the defendant's transferror was a bona fide purchaser.

It follows that the trial court's conclusion of law was not sustained by its findings of fact, and that the judgment must be re-

versed, and this case remanded to the district court with direction to amend its conclusions of law in accordance with this opinion, and enter judgment for the plaintiff.

So ordered.

CANTY, J.

I concur. The agreement between the Nevins Company and Finn was not an agreement for a sale by the former to the latter of an exclusive right or license to use the patents for a consideration of $5,000. It was an agreement that the Nevins Company and Finn should be joint promoters of a corporation; that the Nevins Company should put in this exclusive right, subject to the large royalty of 25 per cent. of the list price of all the articles manufactured, and Finn should put in $5,000 in cash. This was to be the capital of the new corporation, for which $100,000 of its stock was to be issued to the Nevins Company, and $150,000 to Finn.

Leaving the treasury stock out of consideration for the present, it follows that under this contract Finn received his stock for $5,000; and it is fair to presume that the $100,000 issued to the Nevins Company under the same contract was issued for a consideration of no greater proportionate value. Then, if the 1,500 shares were issued to Finn for a consideration of $5,000, the 1,000 shares issued to the Nevins Company must have been issued for a consideration which did not exceed $3,333.33 in value; that is, the latter sum must have been about the value of said exclusive right, subject to said royalty. If Finn's services as promoter can be taken into consideration at all in determining what he paid for his stock, they certainly cannot be to such an extent as to allow for such services the enormous difference between $5,000, the cash he paid, and $150,000, the face value of his stock.

Of course, the Nevins Company might have given Finn something for nothing; but there is no presumption that it has done so, certainly none that it has given him $145,000 for nothing. If any illegality existed in the transaction, all of the stock except the treasury stock is tainted with it.

The Nevins Company would not be allowed to assert that it paid full consideration for the 1,000 shares of stock which it received,

and, if there was anything illegal in the original issue of stock, it was in the fact that Finn did not pay more for the 1,500 shares. The Nevins Company and Finn were joint promoters, and the stock of each was acquired as one transaction, and pursuant to one and the same contract. Then, unless the total consideration paid was a reasonably adequate consideration for the whole 2,500 shares, and any illegality exists, all of those shares are tainted with the illegality. Of course, the Nevins Company by the rights furnished under the patents might have furnished consideration enough for all of these 2,500 shares; but, as it must be presumed that it did not give Finn something for nothing, it follows that it must be presumed that it did not furnish any more consideration than he did.

As the treasury stock was also sold at a grossly inadequate consideration, it sufficiently appears that all of the 4,000 shares of stock were issued at such a grossly inadequate consideration that the issue of all of the stock is fraudulent as to creditors.