## HOLMAN v. THOMAS et al.

### (Circuit Court, W. D. New York. April 2, 1909.

### No. 203.

1. CORPORATIONS (§ 99*)—STOCK ISSUES—ISSUANCE TO PROMOTERS—CONSIDERATION—INADEQUACY.

Plaintiff, who had assisted in devising a scheme to organize a co-operative sugar refining company, made an agreement that it should issue to him 750,000 shares of its capital stock at the par value of $100 each, in consideration of which he agreed thereafter to pay the company $10,-000,000, less $1,000,000 commissions, from the proceeds of shares of stock to be sold by him to retail grocers. The scheme, if carried out, would have resulted in obtaining $9,000,000 from the grocers in return for 207,-107 shares of stock, while plaintiff would receive 417,873 shares, and defendants, under the financial contract sued on, would receive 125,000 shares, in consideration of their providing $100,000, in installments of $10,000 each, to finance the company, to be repaid to them when $10,000,-000 had been received from stock sales. Plaintiff had no good will to transfer to the corporation, and there was no actual exchange of property for stock. *Held*, that the transfer of the stock by the corporation to plaintiff was invalid for want of sufficient consideration as a matter of law.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 444–446; Dec. Dig. § 99.*]

2. CORPORATIONS (§ 99*)—STOCK ISSUES—CONSIDERATION.

Under Gen. St. Minn. 1894, § 3415, providing that corporations having capital stock divided into shares, unless specially authorized, shall not issue any shares for a less amount on each share than the par value of the share first issued, a scheme to dispose of the capital stock of a Minnesota corporation, giving to each purchaser as a bonus an amount of stock equal to that subscribed and paid for, was invalid.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 444–446; Dec. Dig. § 99.*]

3. CONTRACTS (§ 138*)—VALIDITY—PUBLIC POLICY—SALE OF CORPORATE STOCK.

Where a corporation's agreement to transfer 750,000 shares of its stock to plaintiff for promoter's services was invalid for lack of consideration, and defendants, in return for 417,873 shares, contracted to finance the corporation to the extent of $100,000, to be paid in installments, to be repaid to defendants when $1,000,000 had been received from the sales of the stock, such agreement was contrary to public policy, and hence an action could not be maintained for defendant's failure to perform.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. § 138.*]

Seldon Bacon, for plaintiff.
Richard A. Irving, for defendants.

HAZEL, District Judge. This is a motion by defendants for judgment on the pleadings under section 547 of the New York Code of Civil Procedure, as added by Laws 1908, p. 462, c. 166. The action was brought to recover damages against the defendants, amounting to $2,535,346 and interest, for alleged breach of contract. The material allegations of the complaint are substantially as follows: On the 10th of April, 1905, the plaintiff and defendants entered in-

---

to a written agreement by which the latter agreed to provide $100,-000, in installments of $10,000 each, to finance a company to be organized by the plaintiff under the laws of Minnesota for refining sugar. The agreement between the plaintiff and the United States Sugar Refining Company, which was the corporation organized by him, entered into on the 16th day of May, 1905, was that the company would issue to the plaintiff absolutely 750,000 shares of its capital stock, of the par value of $100 each, in consideration of which he would thereafter pay to the company $10,000,000, less $1,000,000 commissions, from the proceeds of shares of the capital stock to be sold by him. To secure the money wherewith to make such payment, the plaintiff agreed to sell stock for cash to a large and miscellaneous number of retail grocers, not, however, exceeding 5 shares to each grocer, and to induce the purchase of stock the plaintiff was authorized by the company to give full-paid and nonassessable bonus shares, equal in number to the paid shares of each subscribing grocer. It was also agreed that, when $1,000,000 had been received from sales of stock, the defendants should be repaid their advances, and the future expenses of exploiting the enterprise, until $10,000,000 was actually received from such sales, would be paid from the collected funds; that plaintiff would deliver the shares of stock bought by grocers, including bonus shares, out of the $75,000,000 of shares issued to him; and that $25,000,000 thereof would be divided equally between the parties to this action. It was further agreed that the plaintiff was entitled to retain and own all shares of stock saved by him on sales made without giving a bonus, or at a bonus less than the 5 shares he was empowered to give.

It is apparent that the corporation was one in form only, and that it was organized with a view of carrying out the scheme of selling stock to grocers in the belief that the parties to this action would eventually make large profits. It appears by the complaint that in the beginning of the promotion of the enterprise the gifts of shares to induce purchasers of stock did not exceed four shares for each five shares sold; but the modified agreement of the parties provided that each grocer was to receive a gift of one share only for each five shares purchased by him. The subscription stock, under the agreement with a grocer, was to have been paid by depositing $10 per month in a bank chosen by himself, where it was to remain until the company was prepared to carry on business, or until it had acquired refineries, when said deposits were to be withdrawn by the company in payment of the stock. Plaintiff claims that the purpose and object of the corporation was to establish a co-operative combination between it and the retail grocers, by which the latter would become interested in the scheme, not only as shareholders, but as prospective customers or buyers of sugar from the company. Other features of the scheme for enormous emolument and profit to the promoter and his allies, the defendants, are indicated in the complaint and exhibits attached thereto; but before discussing the law thought to apply to the controversy it will only be necessary to advert to the allegation that subscriptions to capital stock of the company were obtained to the amount of about $148,000, and that

advances were made by the defendants of about $12,000, when they ceased to comply with plaintiff's demands for more funds, and the project was discontinued, but without loss to the subscribing grocers.

The objections that stock was issued for a grossly inadequate consideration, in violation of the Minnesota statute, and that the scheme was a fraud upon the grocers, may be considered together. Presumably, if the scheme of raising the vast capital and the establishment of the corporation, whose officers were dominated by plaintiff, had succeeded, the assets would approximate $9,000,000, all of which would have been paid or contributed by the grocers in return for 207,107 shares of stock issued to them, while the plaintiff would receive under his agreement with the corporation 417,873 shares, and the defendants under their agreement with the plaintiff 125,000 shares. Manifestly the grocers buying the stock would own but one-fourth of the total number of shares, while the plaintiff and defendants would own a three-fourth interest—a grossly excessive proportion. It appears that the plaintiff devoted his time toward persuading grocers to buy shares, and, except to originate the scheme or plan, he did nothing more. He transferred no tangible property to the corporation in return for the issuance to him of 750,000 shares of stock, but simply promised to sell a portion of his holding to the amount of $10,000,000. Neither he nor the corporation possessed any good will, trade, or established business. His agreement to secure customers and business for the corporation was neither property nor its equivalent; for the successful termination of the projected scheme was problematical, and it could not with reasonable certainty be said that any substantial advantage or benefit would inure to the corporation from plaintiff's agitation. It does not follow that the grocers would have traded with the company merely because of their ownership of stock. It is true that good will is a valuable asset in business, and a person who possesses it as a result of unceasing labor and upright business activity may dispose of it in the same manner as though he were transferring any other class of property; but obviously such is not the present case. Here there was no actual exchange of property for stock. If plaintiff's services before and after the incorporation are considered as property, their value was certainly grossly overestimated, and the consideration for the issuance to him of the capital stock was inadequate as a matter of law. When property is transferred or assigned to a corporation for paid-up stock, the asserted fraudulent character of the transaction is ordinarily one of fact; but, where the overvaluation is great, the possibility of honest mistake is excluded. Hastings v. Iron Range, 65 Minn. 28, 67 N. W. 652.

Furthermore, under the laws of Minnesota, the sale or gift of full-paid stock to grocers is thought to have been invalid. By section 3415, Gen. St. Minn. 1894, it is provided:

"Corporations having capital stock divided into shares, unless specially authorized, shall not issue any shares for a less amount to be actually paid in on each share than the par value of the shares first issued."

Under the doctrine of Rogers v. Gross, 67 Minn. 225, 69 N. W. 894, in which case this statute was construed, it was held illegal to

give or agree to give additional full-paid stock as a gift; and the court said in substance that by promoting the sale of stock which had been previously obtained for nothing, and which did not actually represent anything of value, an opportunity would be given to defraud the public. In Wallace v. Carpenter, 70 Minn. 321, 73 N. W. 189, 68 Am. St. Rep. 530, a case where stock was issued at one-third its value, the court said:

"A certificate for paid-up shares in a corporation is simply a written statement in the name of the corporation that the holder thereof is a stockholder, and that the full par value of his shares has been paid to the corporation. If the shares in fact have not been so paid for, the certificate that they have been is a false representation that the assets of the corporation have been increased to the amount of the par value of the stock so issued; and when a corporation represents that it has a paid-up capital of a given amount it represents to the business world that at the time it issued the stock it received money or property to the full par value of its stock. The issuing of the stock of a corporation as paid up when it is not so in fact is a public and a private wrong, a cheat and a fraud, which enables the corporation to obtain credit and property by false pretenses."

The principle of the cases cited aptly applies to the case at bar. It is true that in the Rogers Case the contract was executory, and the stock had not been actually issued; but the court nevertheless broadly condemned as a fraud agreements by which full paid stock of a corporation was given as a bonus. See, also, Cook on Corporations, § 40. There are Minnesota cases holding that stock issued and sold as full-paid stock, but for less than its par value, are not void, but merely voidable at the instance of creditors; but I think that, where it appears that the company received principally nothing for the issuance of stock, the principle of Rogers v. Gross, Wallace v. Carpenter, and Hastings v. Iron Range, supra, and Hospes v. North Western Co., 48 Minn. 174, 50 N. W. 1117, 15 L. R. A. 470, 31 Am. St. Rep. 637, may safely be applied. I am therefore of opinion that, in a transaction such as this, payment for the stock could have been avoided because of lack of knowledge of the facts. It is clear that the subscribing grocers did not know of the existing arrangements between the plaintiff and the corporation by which the former was to receive an extortionate secret profit, nor were they informed that by the adopted system of operations the parties promoting the scheme acquired more than two-thirds of the property of the corporation.

The plaintiff cannot be heard to urge that, notwithstanding the invalidity of the issue of full-paid stock, the defendants are liable to him for breach. The contracts which are the subject of this controversy, namely, the contracts between the plaintiff and the corporation and between the parties to this action, were entered into for the express purpose of effectuating the unlawful scheme to dispose of the stock. By their agreement the defendants were to supply finances to carry out the common design. In such a situation it is the universal rule that from motives of public policy a court will not give assistance to either party to promote the unlawful end. Manterne v. Horwitz, 101 N. Y. 469, 5 N. E. 331; Church v. Proctor, 66 Fed. 240, 13 C. C. A. 426; Miller v. Ammon, 145 U. S. 426, 12 Sup. Ct. 884, 36 L. Ed. 759; Ewell v. Daggs, 108 U. S. 149, 2 Sup. Ct. 408, 27 L. Ed. 682; Sirkin v. 14th St. Store, 124 App. Div. 384, 108 N. Y. Supp. 830.

In deciding the vital questions presented, the court does not ignore the allegation of the complaint that before the agreements in controversy plaintiff had already performed services in the "development and amelioration of plans for financing" the American Co-operative Sugar Company and a large amount of money had been expended, etc.; but, assuming the truth of that allegation, it is not manifest that such services were so substantial in character as to warrant attaching thereto a weighty pecuniary value. There are other grounds presented in the various exhaustive briefs submitted by the defendants for granting this motion to dismiss the complaint; but, in view of what has hereinbefore been stated, they need not specially be considered or passed upon.

The motion to dismiss the complaint on the pleadings is granted.